FARMERS' FEED CO. OF NEW YORK v. INSURANCE CO. OF NORTH AMERICA.

(District Court, S. D. New York.   March 21, 1908.)

INSURANCE—MARINE INSURANCE—ACTION ON POLICY—DEFENSE OF UNSEA-WORTHINESS.

Where the underwriter knows the age and defective condition of a vessel, and accepts an unusual risk thereon at nearly a double premium, it is liable, notwithstanding an absence of complete seaworthiness, and is not permitted to urge the lack thereof as a defense, even though the policy required it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1049.]

In Admiralty.

Wing, Putnam & Burlingham, for libellant.

Kneeland & Harrison, for respondent.

ADAMS, District Judge.   This action was brought by the Farmers' Feed Company to recover from the Insurance Company of North America, the loss on a cargo of 224 tons of brewers' dried grain, happening while being transported in the barge Lydia L. Mackay, during the navigation of the harbor of New York on or about the 11th of September, 1906. It is alleged that the barge was in all respects seaworthy and the loss, amounting to more than $5,000, was incurred by reason of the perils insured against. It is further alleged that in consideration of the premium paid, $157.50 for a period of one year from April 30, 1906, which greatly exceeded the usual rate, the respondent, after inspecting the barge, waived any warranty as to her seaworthiness. The respondent admitted the issuance of the policy and the sinking of the barge with the cargo described, but denied the other allegations of the libel. For a further defense it alleged that the barge at the time of her loading and loss was in a wholly unseaworthy condition and the sinking and loss were due thereto.

From the testimony it appears that the Mackay was a vessel of 30 or 40 years of age and was well known to the underwriter, which had a record of her as follows:

"May 9, 1905

Particulars of covered barge Lydia Mackay of N. Y.   Length 110 feet; beam 32 feet, draft loaded with about 250 tons of grain is six feet six with a freeboard of three feet six. When built not known, but must be very old. She has single keelsons; inter-costal trestle work frame; full wood hanging knees, ceiled; she is strongly built and was formerly a brick scow; she has good oak wearing pieces fore and aft. Her bottom is said to have been caulked fall of 1904 and her top sides more than two months ago; her decks

have not been caulked it is said for over six years 'they are very open'. Her house is in good condition; she has some decayed wood; some knees nearly gone. For a hull risk not recommended, as she had some trouble last winter by ice, but might be a desirable risk for summer where she has so much free-board. Owned by the Farmers' Feed Company."

When the respondent was applied to for the insurance on cargoes of the Mackay and two other barges by a broker for the libellant, the agent of the respondent, one of its underwriters, who was authorized to pass upon and accept or reject risks, said they would inspect the vessel and let the applicant know whether they cared to take the risks. The broker further testified:

"A. I called again in the course of three or four days, and they said they would write the cargo of this boat, but at 3½% rate.

Q. What did you say? A. Well, I said, 'I will try some of the other companies, and let you know.'

Q. Are you familiar with rates? A. Yes.

Q. Were you at that time and are you now? A. Yes.

Q. And have you been for the past 10 years or so? A. Yes.

Q. What is the ordinary rate on cargoes on old boats in the harbor; time policies?

Objected to unless the witness knows that there is a rate.

Q. Is there a customary and usual rate in this port for premiums on policies on cargoes on old vessels or barges, canalboats, etc.? A. I don't think there is any regular rate, no.

Q. It is a matter of agreement, in other words? A. On older vessels, yes sir.

Q. Mr. Hall told you that he would charge 3½%? A. Yes.

Q. On the cargo? A. Yes.

Q. And you said that you would look around? A. Yes, look around and let him know if we wanted the insurance at that rate.

Q. Did you go back again? A. I went back two or three days afterwards, and my recollection is that I told him that he was elected; that the company were willing to pay their rate of 3½%; and he said, as they had quoted that rate they would make the risk binding.

Q. Did he say anything about the rate then to you?

Objected to.

Q. What did he say, in full? A. I think he said that they thought of making the rates so high that it was practically impossible, and they would not get the risk; but as they had quoted that rate they would do it.

Q. What did you say about being elected? A. Meaning to convey that they were going to get the risk they had quoted on.

Q. In any of these conversations, in which was the statement made by Mr. Hall to you that the boat had been inspected? A. At the first conversation he said they would look at the boats, and let me know if they cared to quote on them; but it was never stated that they did inspect the boats. I haven't the slightest idea whether they did or not."

The underwriter for the respondent testified:

"Q. Is there no usual rate on cargoes on boats, of this same class, after five years old? A. No sir; not on cargoes.

Q. You charge anything you can get? A. We charge anything we can get.

Q. What do you get? You don't get over two and a half, do you? A. Not much.

Q. You don't get much more than you get on the hull I suppose? A. It depends.

Q. You have a great many of these cargoes insured, have you not? A. We do, sir.

Q. Is there not any standard that any business man, and owner of cargoes, can know about before she goes to you; is it a matter of individual

bargaining? A. On cargo it is pretty nearly always individual bargaining, in every case; because the nature of the cargo differs and the boats differ.

Q. Take a boat like this; brewers' grain dried in bags? A. Yes, I know it.

Q. Do you charge whatever you think you can get on the particular day when the broker comes in? A. Yes.

Q. Are there no limits? A. Well—

Q. Take a cargo on a boat from Newtown Creek, we will say, to the North River; a boat five years old, or under; is it entirely uncertain what you will charge if we come to you? A. We have our ideas, and other companies have theirs.

Q. You have a tariff? A. No sir.

Q. Haven't you a tariff of your own? A. Our own tariff, and our own office: that is, we would have our ideas; we don't call it a tariff.

Q. Well, you insured other boats of the Farmers' Feed Company besides the Lydia Mackay, did you not? A. Yes, we did.

Q. And other cargoes? A. Yes.

Q At lower rates than three and a half too? A. I think not; I am not sure.

Q. Have you looked it up? A. No.

Q. You have no means of knowing that? A. Not without referring to the books; I couldn't possibly remember the number of risks I take.

Q. You had a report from one of your surveyors in May, 1905? A. Yes sir.

Q. Have you that here? A. It is right in this book (indicating).

Q. Will you produce it? A. Yes sir (Witness examines book and produces report asked for, at page 115).

Q. You remember Mr. Whitlock coming in to make this application? A. I do, sir.

Q. Do you remember his coming three times, as he says? A. Two or three times.

Q. Do you recall that when he first came you didn't give him a figure; do you recall that fact? A. Yes sir, I do.

Q. Did you tell him then, as he says, that you would look her up? A. Yes sir.

Q. Did you look her up? A. After he left.

Q. Is this what you meant by 'looking up'; refer to this report? A. Instead of answering your question directly I will state the case. After he left, I was going to send and find out, and as our custom is, I looked in our books and found the report; I had the report and referred to that report.

Q. And so you didn't deem it necessary to make another inspection? A. Yes sir, we declined the risk.

Q. What was the application by Mr. Whitlock? A. If I can remember, I think it was that on both the hull and cargo; I am not quite sure.

Q. What do you mean by saying you declined the risk? A. From that report of Captain Crowell we thought we would rather be without the business than have it.

Q. But you subsequently took it? A. Not the hull; but the cargo, we did.

Q. When you say you declined the risk what did you say to Mr. Whitlock, when he came in after you had looked up the report? A. I think I said we were very much obliged, but we would prefer to decline the risk; that is the substance of it.

Q. Whatever his application was—and you don't recall exactly—you declined it? A. Yes.

Q. And then subsequently he came to you again? A. Yes, he came to me again.

Q. And then you took part of the risk, did you? A. We took the cargo.

Q. When you declined the risk on the second interview with Mr. Whitlock did you state a figure? A. I expect I did.

Q. I don't understand how the stating of a rate is consistent with your statement that you declined the risk. Do you mean that the risk was so high that you thought that was equivalent to a declination? A. No, I didn't mean to convey that; when he first applied it was on the hull, and we declined that; we preferred to be without the risk on that.

Q. I thought you said when he first applied he applied on both hull and cargo, and that you declined both. A. I believe we did.

Q. And what led you to change your position with reference to it? A. If I remember correctly, I think we had a previous boat—one of the Farmers' Feed Company boats, the Mercury, I think, and Mr. Whitlock said, 'As long as you have had one boat, you might help them out by taking their cargoes, even if you don't want the boat;' I believe that it was that that influenced me to name rates on the cargo when we had already said that we would prefer to be without either hull or cargo.

Q. You don't mean that your Company had a sympathetic feeling for the Farmers' Feed Company, do you? A. It isn't often we have, but in this case—

Q. I thought it was a pure matter of business; what do you mean by saying that because you had taken another risk, and a past liability, that therefore you would add to your own burden by taking a new boat? A. The Farmers' Feed Company had four boats, and we had a line on the Mercury which was supposed to be the best boat of the Farmers' Feed Company.

Q. Supposed by whom? By you? A. Yes, by us.

Q. From your inspections? A. I can't remember that.

Q. From the reports of your surveyors? A. But we had her cargo, and as we had that boat we were asked to take the other three for the same concern.

Q. Well, your action was based ultimately on this report, in this book? A. Yes sir.

Q. That was what you acted on? A. Yes sir.

Q. And the reason you didn't send a surveyor to inspect her again, was because you thought this report sufficiently unfavorable to justify you in declining the risk; is that it? A. Quite so."

Thereafter the policy in suit was issued and contained the following, upon which the respondent relies:

"And it is warranted by the insured that the said lighter or vessel shall, at all times during the continuance of this Policy, be tight. * * * "

"It is understood and agreed that no custom, usage or waiver of any kind shall affect, control or void any condition of this policy, unless endorsed hereon in writing."

As stated above, the Mackay was an old vessel but seemed to be in fairly good condition for the carriage of cargoes except, perhaps, as to her sides near the deck, which showed more weakness than her body below a line about 3 feet from the deck. She had been carrying cargoes safely. On a trip made to the same place very shortly previous to this occasion she had transported a similar cargo without loss and doubtless would have done so in this instance if she had not been towed alongside of another barge. The accompanying barge was a light coal boat and in approaching the vicinity of the Brooklyn Bridge, the waters were rough enough to cause the coal boat to pound against the Mackay, with the result that the latter began to take in water. The coal boat was towed on the port side and the effect of the pounding was to remove a patch covering a hole near the upper wearing piece of the Mackay, and leave this hole exposed to the splashings of water between the boats, necessarily incident to the towing. Probably in this way, enough water got into the boat to cause her to career somewhat to the starboard, and to continue to take in water until she was sunk to her deck in an hour or two, and two or three hours later to the bottom, in the vicinity of the steamer's pier, where she was consigned.

The Mackay was a weak boat as to her deck and upper sides and strictly in these respects she was defective but the respondent knew

all about her and had a record which showed her to be an undesirable risk. She was, therefore, rejected by the underwriter as to the hull but accepted for cargo with a full knowledge of her condition. The respondent had caused an examination of her to be made in May, 1905, and in the report thereof, it was said:

"For a hull risk not recommended as she had some trouble last winter by ice, but might be a desirable risk for summer where she had so much freeboard."

The risk was subsequently taken, without any new examination at a rate of nearly double that which would have been demanded if she had been a comparatively new boat, and the loss occurred, not probably in a way which the underwriter expected but in one which should have been reasonably anticipated as the method of towing was not unusual. The boat was no doubt in a condition to go in safety if she had been towed alone but when she was exposed to the pounding of another boat in the often disturbed waters of the East River, then her weakness became apparent and the sinking followed.

Strictly, she was not competent to resist the ordinary action of the waters she was required to navigate in and the respondent strongly urges that the claim should be rejected. If it were not for the knowledge the respondent had of the boat, there would be much to sustain the contention, but when it knowingly took the risk, at a high premium, I think it should be held to its bargain and not be permitted to resort to the terms of the policy to overcome the claim. It has often been determined that the words of a policy of insurance do not preclude a party from recovering upon the actual contract, even if inconsistent with the wording of the policy. Forward v. Continental Insurance Co., 142 N. Y. 382, 37 N. E. 615, 25 L. R. A. 637; Wood v. American Fire Insurance Co., 149 N. Y. 382, 44 N. E. 80, 52 Am. St. Rep. 733; Thebaud v. Great Western Ins. Co., 155 N. Y. 516, 50 N. E. 284. In the last case O'Brien, J., said (pages 519, 521, 522, 524, of 155 N. Y., pages 285, 287, of 50 N. E.):

"It is no doubt the general rule that in all contracts of marine insurance upon vessels there is an implied warranty that the subject of the insurance was at the time seaworthy, or, in other words, reasonably fit and capable of making the voyage. But in this case both parties knew that the vessel was not intended for service upon the open sea. She was not built or constructed for any such purpose, but, on the contrary, for the river service. Before the defendant entered into the contract the plans and specifications with reference to the construction of the Dos Hermanos had been submitted to its agents. They put the defendant in possession of all information concerning the character and construction of the craft. The defendant's marine engineer, who had had considerable experience, assured the broker who took the risk 'that she was built for the river trade, and he did not consider that she was just the thing to attempt all weathers on the coast going around there, but if properly handled she might get there, provided she took the inland course so far as possible."

"* * * We can discover no reason why the general rule applicable to the risks in fire insurance policies does not apply to this case. As was said by this court in the case of Bidwell v. North Western Ins. Co., 24 N. Y. 302: 'Indeed it is not easy to perceive why an insurance company, by reason of the formal words of clauses (of a general and comprehensive nature), inserted in a policy intended to meet broad classes of contingencies, should ever be

allowed to avoid liability on the ground that facts, of which the company had full knowledge at the time of issuing the policy, were then not in accordance with the formal words of the contract, or some of its multifarious conditions. If such facts are to be held a breach of such a clause, they are a breach eo instanti of the making of the contract, and are so known to be by the company as well as the insured. And to allow the company to take the premium without taking the risk would be to encourage a fraud."

"* * * But the real question presented to the defendant, when the application for insurance was made, was whether this boat, as she was known by both parties to be, could make the transit from the port of departure to her destination. The defendant concluded to take that risk in consideration of a double premium, and to permit it now, after receiving the premium, to defeat a recovery, on the ground that she 'was not seaworthy in consequence of alleged defects of construction, known to it at the time of taking the risk, would scarcely be consistent with commercial morality."

I conclude that the libellant is entitled to recover. The decree will provide for an order of reference.