## COMPAÑIA DE NAVEGACION INTERIOR, S. A., v. FIREMAN'S FUND INSURANCE COMPANY.*

Nos. 510 to 520, inclusive.   Argued April 19, 1928.—Decided May 14, 1928.

---

* The ten other suits were by the petitioner against ten other insurance companies, severally.

Mr. John D. Grace with whom Messrs. M. A. Grace and Edwin H. Grace were on the brief, for petitioner.

Mr. T. Catesby Jones, with whom Messrs. Henry P. Dart, Jr., Robert H. Kelley and James W. Ryan were on the brief, for respondents.

No peril of the sea was encountered. There was no catastrophe, suddenly encountered, which triumphed over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety. *The Rosalia*, 264 Fed. 285. It has long been settled that the fact of sea-water entering a vessel's hull does not constitute in itself a peril of the sea. *The Folmina*, 212 U. S. 354; *The Jungshoved*, 290 Fed. 733.

The burden was on petitioner to prove seaworthiness. *Richelieu Navigation Co.* v. *Boston Insurance Co.*, 136 U. S. 408; *Pacific Coast S. S. Co.* v. *Bancroft-Whitney Co.*, 94 Fed. 180.

Wind and waves such as were encountered by the *Wash Gray* and which must be expected on a voyage, have uniformly been held not to amount to a peril of the sea. *The Rosalia*, 264 Fed. 285; *The G. R. Booth*, 171 U. S. 450; *The Gulnare*, 42 Fed. 861; *Morse* v. *St. Paul Insurance Co.*, 124 Fed. 451; *Higgie* v. *American Lloyds*, 14 Fed. 143; *The Rappahannock*, 184 Fed. 291; *Mr. Justice Story, in The Reeside*, Fed. Case No. 11,657; *Union Marine Ins. Co.* v. *Stone*, 15 F. (2d) 937; Winter on Marine Ins., 1919 ed., p. 140; *Bullard* v. *Roger Williams Ins. Co.*, 1 Curtis 148; *Swan* v. *Union Ins. Co.*, 3 Wheat. 168; *Donnell* v. *Columbian Ins. Co.*, 7 Fed. Cas. p. 891, Case No. 3987; *Prohaska* v. *St. Paul Insurance Co.*, 270 Fed. 91; *Leerdam etc., owners of S. S. Leerdam* v. *Mediterranean & General Traders, Inc.*, 17 F. (2d) 586; *The

*Asuarca*, 291 Fed. 73. *The Tornado* (*Klein* v. *Globe &
Rutgers Ins. Co.*, 2 F. (2d) 137), distinguished.

_ The dictum in *The Tornado, supra,* that what consti-
tutes a peril of the sea depends upon the size of the
vessel insured, does not correctly state the law. Its ap-
plication to facts such as are involved in the present case
would lead substantially to the conclusion that a policy
of marine insurance is not, as Lord Herschell says, " an
insurance against accidents which happen, but an insur-
ance against events which must happen." See *The
Xantho*, 12 App. Cas. 503; *British & Foreign Ins. Co.* v.
*Gaunt*, 2 App. Cas. 41.

To insure such a vessel against perils of the sea, does
not amount to the underwriter warranting that she is fit
to encounter perils of the sea. The only warranty in the
policy of insurance is the warranty of the assured, not the
warranty by the underwriter. As Lord Mersey said in
*Sasson* v. *Western Assurance Co.* (1912), A. C. 561: "An
insurance against the ʻ perils of the sea or other perils ʼ is
not a guarantee that a ship will float."

The petitioner has failed to sustain the burden of prov-
ing that the sinking of the boat resulted from one of the
few specified perils insured against in these policies.

Unseaworthiness of a vessel may be one or both of two
things; first, a breach of the implied warranty of sea-
worthiness which is contained in every marine policy un-
less expressly excluded (*Hazard* v. *New England Ins. Co.*,
8 Pet. 557); second, a cause of loss. Considered as a
breach of warranty, unseaworthiness may undoubtedly
be waived by the underwriter. The waiver, however,
should always be expressed in writing in the policy in the
clearest language. Arnould on Marine Insurance, § 686.
Considered as a cause of loss, even where there is no
warranty, a loss from unseaworthiness is not a peril in-
sured against. This was specifically decided in *N. O. T.
& M. R. Co.* v. *Union Marine Ins. Co.*, 286 Fed. 32. See

also *Grant Smith & Co.* v. *Seattle Construction Co.*, 1920, A. C. 162.

In other words, even though the underwriter admits in the policy that the vessel is seaworthy, the assured is not entitled to recover where the loss is not shown to have been caused by a peril of the sea or other of the specific perils insured against. *A fortiori* this must also be so when the evidence indicates that the loss was caused by unseaworthiness.

It is undoubtedly true that unseaworthiness, considered as a breach of the implied warranty of seaworthiness, is a special defense which must be affirmatively pleaded and proved by the underwriters. Petitioner, however, overlooks the distinction between unseaworthiness as a breach of the implied warranty of seaworthiness, and as a possible cause of loss. If the loss was caused by unseaworthiness, the petitioner cannot recover and there is no need for the defendant underwriters to set up unseaworthiness as an affirmative defense. *New Orleans, T. & M. Ry. Co.* v. *Union Marine Ins. Co.*, 286 Fed. 32; *Swan* v. *Union Insurance Co.*, 3 Wheat. 168; *The Lakeland*, 1927, A. M. C. 1361; *Richelieu Navigation Co.* v. *Boston Ins. Co.*, 136 U. S. 408; *Firemen's Fund Ins. Co.* v. *Globe Navigation Co.*, 236 Fed. 618; *Coles* v. *Marine Ins. Co.*, Fed. Cases, No. 2988; *Cary* v. *Boylston Fire Ins. Co.*, 107 Mass. 140; *Van Vliet* v. *Greenwich Ins. Co.*, 14 Daly (N. Y.) 496.

If any cause of loss is shown, it is the uninsured risk of negligent towage. Obviously, it was negligence to tow this small tug at the rate of nine miles an hour, behind a large steamer with such a short tow line. *Peace River Mining Co.* v. *Mulqueen*, 285 Fed. 102; *The Mariner*, 1927, A. M. C. 363; *The Marie Palmer*, 191 Fed. 79; *The Inca*, 148 Fed. 363; *D. W. Ryan Towboat Co.* v. *Draper*, 263 Fed. 31; *The Manhattan*, 186 Fed. 329.

The fact that the contract of towage relieved the towing vessel from all responsibility for negligence was a fact material to the risk which should have been disclosed to the underwriters, and its concealment voided the policy. The policy specifically provided that any agreement whereby any right of recovery of the assured against any vessel or person is released, decreased, transferred or lost, voided the policy. *Sun Mutual Ins. Co. v. Ocean Ins. Co.,* 107 U. S. 485; *Tate & Sons* v. *Hyslop,* 15 Q. B. Div. 368; *Phoenix Ins. Co.* v. *Parson,* 129 N. Y. 86; *The Turret Crown,* 297 Fed. 766; *The Oceanica,* 170 Fed. 893; *Ten Eyck.* v. *Director General,* 267 Fed. 974; *McWilliams* v. *Davis,* 285 Fed. 312; *Hand & Johnson Tug Line* v. *Canada S. S. Lines,* 281 Fed. 779; *British Columbia Barge Co.* v. *Mylroie,* 259 U. S. 1; *The Pacific Maru,* 8 F. (2d) 166; *The Sea Lion,* 12 F. (2d) 124.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

These are eleven libels filed in the District Court of the United States for the Eastern District of Louisiana by a Mexican corporation known as the Compañia de Navegación, against as many different insurance companies, English and American, on eleven separate policies, insuring the tug "Wash Gray" in favor of the libelant as owner in different sums aggregating $85,000, and covering a voyage of the tug while in tow from Tampico, Mexico, to Galveston, Texas.

The tug was designed for inland waters. She was 87½ feet long, with 19 feet beam, 9 feet depth of hold, and was of 105 tons. She was insured specially for this sea voyage, to be towed as agreed with the Insuring Companies by the "Freeport Sulphur No. 1," a vessel engaged in regular trade on the Gulf of Mexico, and measuring 309 feet in length, 45 feet beam, with 22½ feet depth, and of approximately 3,000 tons displacement.

When application was made for insurance, the underwriters required an inspection for seaworthiness, general fitness and towing arrangements for that voyage. For that purpose two well known marine surveyors, representing the various underwriters, made a thorough, critical inspection, followed by recommendations for preparations for the voyage, including certain overhauling, particularly of her towing bitts and decking, and for the planking up of doors, ports, and other openings. They reported in writing to the underwriters that the requirements had been complied with, and certified her seaworthiness, and her fitness for the particular voyage. Because of the extra hazardous risk involved in the transit of this small inland vessel in tow at sea, the premiums were much increased by the underwriters. They varied, in the different policies, between one and one-half to two and one-eighth per cent., or from six to more than eight times the usual rate for a tow of the ordinary size and power to resist the sea. The voyage contemplated was first to Freeport, Texas, a distance of some four hundred and twenty miles, a trip taking some forty-five or fifty hours. From there, she was to go to Galveston by another towing vessel, also to be satisfactory to the underwriters. The weather from Tampico was fair and the sea calm. She followed nicely, handled well, and continued in tow through the first night and through the next day, making some nine miles per hour with no straining or difficulty. Ordinarily, under her own power, she was good for from ten to twelve miles per hour. During the second evening, came a fresh to strong northwesterly breeze. Later the weather grew squally, until, about 8 o'clock, the wind reached a velocity of twenty-five miles an hour, with occasional puffs or gusts. Because of these and a cross current and swell, the sea grew choppy, with waves running up four to five feet from trough to crest, and sufficient to break over her head. The rough weather and the choppy seas put a strain on

the vessel. As required by contract, she had up all steam necessary to work her pumps. The mate was sent below and in a few minutes reported to the captain that the forward bitts had worked loose, that her seams were opening, and she was taking water rapidly. The pounding and straining continued until she made more water than her pumps could discharge. She was then about 100 miles from Freeport, Texas, and had completed three-fourths of the voyage to that point. The "Wash Gray's" captain signalled to the towing ship to stop. The water in the tug had rolled forward, thus bringing her head down. The tow lines were then cut. This brought her head up and she righted herself. The larger vessel stood by. The captain of the "Wash Gray" notified the towing captain that the tug could stand no more pulling. Shortly thereafter the captain and crew of the tug were taken aboard the ship for safety. The latter then stood by until daylight when the master sent his engineer, mate and some six men on board the tug to attempt to save her. They found no water in the boiler for steam. They attempted by a hose to pump it in, but the leaking sea water put out the fire. The vessels then proceeded slowly at one mile per hour until half past ten when the tug began to sink slowly and went down at half past eleven.

The District Judge found for the owner of the "Wash Gray" on all the policies. The Insurance Companies appealed to the Fifth Circuit Court of Appeals, which without objecting to the facts as found by the District Court reversed the case with directions to dismiss the libels.

Counsel for the Insurance Companies seek to sustain the judgment of the Circuit Court of Appeals on four grounds. They say, first, that the Insurance Companies were released from liability because there was not disclosed to them before the voyage a contract of towage, a term of which was material to the risk and was concealed and the policies were thus avoided. The towage contract provided as follows:

" Freeport Sulphur No. 1 will furnish hawser.   All other risk and expense to be borne by the tug.   It is understood you will keep sufficient men on board to keep up steam and man the tug's pumps.   S. S. Freeport No. 1 is not responsible in any way for loss or damage to the Wash Gray."

All the policies had attached to them by rider and rubber stamp a clause like the following:

"Any agreement, contract or act, past or future, positive or implied, by the Insured whereby any right of recovery of the insured against any vessel, person or corporation is released, decreased, transferred or lost, which would, on acceptance of abandonment, or payment of loss by this company, belong to this Company but for such agreement, contract or act, shall render this policy null and void as to the amount of any such loss or damage, but the Company's right to retain or recover the full premium shall not be affected."

We do not think that the towing contract has the effect claimed for it by the companies.   It did not release the " Freeport " from any loss or damage to the " Wash Gray " due to the negligence of the master or crew of the towing vessel; and for a loss thus caused the companies would be subrogated to the claim of the owner of the " Wash Gray."

The rule laid down by this Court in *The Steamer Syracuse*, 12 Wall. 167, 171, covers the point.   That was a libel by the owner of a canal boat against the Steamer Syracuse for negligence in towing the canal boat and running her into a vessel at anchor in the harbor of New York.   The claim was made that there had been a special agreement between the canal boat and the steamboat by which the canal boat was being towed at her own risk.   Upon this point the Court said:

" It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that, by special agreement, the canal-

boat was being towed at her own risk, nevertheless the
steamer is liable, if, through the negligence of those in
charge of her, the canal-boat has suffered loss. Although
the policy of the law has not imposed on the towing boat
the obligation resting on a common carrier, it does require
on the part of the persons engaged in her management,
the exercise of reasonable care, caution, and maritime skill,
and if these are neglected, and disaster occurs, the towing
boat must be visited with the consequences."

In view of this state of the law, the towing contract here
shown was not a fact material to the risk, a concealment
of which from the underwriters would injure them or avoid
the policy.

The second objection is that the tug was negligently
towed at too great a speed, proximately causing the loss.
There is really very little evidence to sustain the claim that
there was any negligence on the part of the towing vessel
or her master or her crew. The trial court specifically
found that the towing was well done, that nine miles an
hour was not too fast a speed to be maintained, but that
on the contrary the maintenance of such speed was neces-
sary in order to prevent the towed vessel from turning
over or careening, and there is no finding to the contrary
by the Court of Appeals.

The third objection is that the tug was not seaworthy
and therefore the risk never attached. The finding by
the trial court distinctly negatives any such claim. It
said:

"Libellant's case, upon this point, does not depend
entirely on the fact that, as a condition precedent to the
underwriting, the insurers required and obtained inspec-
tions, detailed recommendations of two expert marine sur-
veyors, and a certificate of compliance with all require-
ments deemed by them necessary to show that the Wash
Gray was seaworthy and fit, equipped and apparelled with
a view to the particular voyage, in tow of the particular

ship Freeport, to be thence towed by another approved by them to Galveston, for the specific known purpose of general overhauling and changing her engines. There is, additionally, the oral testimony which clearly shows that these surveyors were correct in their report and had competently functioned in making their recommendations and accepting the compliance by the owner, as per their certificate. The unwarranted assumption that the Wash Gray pulled apart, upon the contrary, as argued in the brief of respondents, is not sustained by the evidence. She did not pull apart in any particular. It is conclusively shown, and uncontradicted, that her forward bitts pulled loose because of the extraordinary straining and pounding under the stress of weather encountered. This was overcome, as the evidence shows, by the rigging of the Spanish windlass. The water which caused the sinking was shipped through her seams, from which the caulking had worked by the same cause. The only hope of overcoming this was by pumping, but pumping was inadequate."

This issue, however, brings up clearly the difference between the view of the District Court and that of the Court of Appeals in respect to liability in this case. What does "seaworthy" mean in the implied or expressed warranty to which the insured is to be held?

Arnould on Marine Insurance, Vol. II, tenth English edition, says:

"Sec. 710. It is obvious that there can be no fixed and positive standard of seaworthiness, but that it must vary, with the varying exigencies of mercantile enterprise. 'The ship,' said Lord Cairns, 'should be in a condition to encounter whatever perils of the sea a ship of that kind, and laden in that way, may be fairly expected to encounter' on the voyage. *Steel* v. *State Line S. S. Co.* (1877) 3 App. Cases, 72, 77. . . .

"Again the class of vessel may be such as will not admit of being put into that condition of seaworthiness

requisite in ordinary cases for the contemplated voyage. The effect of this is not to dispense with the implied warranty of seaworthiness, but to accommodate the warranty to what is reasonably practicable in the particular case. But the underwriter must be informed of the peculiar nature of the risk. Thus, if a steamer built for river navigation is to be sailed from this country to Calcutta or to Odessa, and the underwriter accept the risk with full information as to the class of vessel and the intended voyage, the assured is only required to make her as seaworthy for the voyage as is reasonably practicable with such a vessel by ordinary available means." *Burges* v. *Wickham* (1863) 3 B. & S. 669; *The Vortigern* (1899) P. 159; *Clapham* v. *Langton,* 34 Law Journal, Q. B. 46; *Turnbull* v. *Jenson,* 3 Aspinwall W. S. 433.

This view of varying seaworthiness according to the circumstances known to both parties is fully supported in the case of *Thebaud* v. *Great Western Insurance Company,* 155 N. Y. 516. There the plaintiff applied to the defendant insurance company to insure, for a voyage from Philadelphia to Frontera, Mexico, a steamer in course of construction for use on rivers and inland waters. The defendant caused the vessel to be examined by an engineer, and issued the usual marine policy, exacting, however, a double premium. The vessel proceeded part of the way on her voyage, avoiding the sea, but in reaching Mexico she had to put out to open sea and was lost. It was held that as both parties to the contract knew that the vessel was not a sea-going craft or suitable for the navigation of the high seas, and as the defendant issued its policy with full knowledge of the nature of the risk, the warranty of seaworthiness, implied in a contract of marine insurance, should not be construed in a way to be repugnant to the general purpose of the parties in executing the contract, nor held to be broken by the

fact that the vessel was not so constructed as to be fit for a sea voyage. See 4 Joyce on Insurance, § 2159.

In *Klein* v. *Globe & Rutgers Insurance Company*, 2 F. (2d) 137, decided by the Circuit Court of Appeals of the Third Circuit, the policy covered an upper river steamboat for a voyage down the Mississippi River to New Orleans, and from there in tow down the river and across the Gulf to Tampico, for which a higher premium than usual was paid. She was bulkheaded and otherwise prepared under the supervision of the agents of the insurance company for her voyage to Tampico. She was inspected and found to be thoroughly all right at the mouth of the Mississippi River, but after she was being towed in the Gulf, an examination disclosed considerable water in the hold and thereafter the vessel sank. It was held that the implied warranty of the insured was that the boat was seaworthy to the extent of being able to withstand all the ordinary perils of navigation of the upper river and that the perils of the sea in the Gulf, against which she was insured, were such perils as would be extraordinary to a vessel of her type. Judgment was given for the insured.

Again, in the *Farmers' Feed Company* v. *Insurance Company of North America*, 166 Fed. 111, affirming the District Court for the Southern District of New York, 162 Fed. 379, the defendant insurance company, knowing the age and exact condition of a barge, insured her for operation in waters adjacent to New York at a high premium. The loss occurred by reason of wind and tide near Brooklyn Bridge, and the defense was unseaworthiness. The Second Circuit Court of Appeals said:

" The Mackey was undoubtedly very old and somewhat decayed, but her condition, her history and all the facts regarding her were fully known to the company at the time the policy was executed, a written record stating

all the particulars being on file with the company. The underwriters knew that she was not a desirable risk, they knew they were taking more than an ordinary hazard and they guarded themselves against it by charging more than the ordinary premium. The theater of the Mackey's operations was, by the express terms of the policy, confined to the waters adjacent to New York, practically New York harbor. The ordinary perils of the sea were not intended, but only such perils as were to be encountered in the comparatively quiet waters referred to. The question of seaworthiness must be considered in the light of the service required. . . ."

The fourth objection claimed by the respondents is that no recovery could be had because the loss of the "Wash Gray" was not caused by any peril insured against. These policies all contained a clause like the following:

"It is the intent of this insurance company by this policy to fully indemnify the insured against the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters above named."

It is urged by the Insurance Companies that weather when the wind did not exceed a velocity of twenty-five miles, though with squalls, and with a cross current and swell producing a choppy sea with waves five feet high and breaking over the head of the vessel, did not constitute a peril of the sea.

There was some emphasis too placed by counsel for the companies on the log of the "Sulphur No. 1" in which the state of the weather and of the sea seemed to be minimized. Upon this point the trial court finds it to be unreliable because the entries in the log do not seem to have been made at the times of the observations they record and moreover the entries were made from the standpoint of a vessel of 3,000 tons, and not one of a vessel of the size of the "Wash Gray." The court said:

" What amounts to a light breeze, or a small swell, or a choppy sea, as logged for a large ocean-going steel vessel, would be relatively, if logged for a little inland wooden tug, with two or three feet of freeboard, an extremely dangerous gale and rough sea. The first would ride comfortably, safely and easily, while the other would toss and pound furiously, strain her timbers, lose the caulking of her butts and seams, and so contrast the comparative calm for one to the comparative fury for the other. The oral testimony, however, makes such speculation and refinement unnecessary, since it convincingly shows that for the ' Wash Gray ' in the open Gulf, the wind and the condition of the sea were extremely perilous; that both the towing ship, its officers and crew and the crew of the little tug omitted nothing that good seamanship, skill and prudence would indicate."

But it is contended on behalf of the insurance companies that the phrase " perils of the sea " has not a varying but an absolute meaning, and they rely on the language of Mr. Justice Story in the *Reeside,* 20 Federal Cases, No. 11,657, p. 458 (2 Sumn. 567), quoted and approved in *Garrison* v. *Memphis Insurance Company,* 19 How. 312. In the former case the question was whether great damage to bales of carpeting by absorbing oil which had leaked from a number of casks, said to have been improperly stowed, was occasioned by the perils of the sea and the extraordinary rolling of the schooner during the voyage. Justice Story said:

" The phrase ' danger of the seas,' whether understood in its most limited sense, as importing only a loss by the natural accidents peculiar to that element; or whether understood in its more extended sense, as including inevitable accidents upon that element, must still, in either case, be clearly understood to include such losses as are of extraordinary nature, or arise, from some irresistible

force, or some overwhelming power, which can not be guarded against by the ordinary exertions of human skill and prudence."

But we think the definition of "dangers of the sea" by Justice Story was meant by him to be applied in the ordinary case of a sea-going vessel with no special circumstances as to the exceptional character of the vessel known to both parties and recognized by both in a high premium charged and paid. A contract of maritime insurance is usually not different from any other contract except that the words and phrases used may have a technical nautical meaning to be understood by the parties and enforced accordingly. We have seen however from the cases that the term "seaworthiness" varies with the circumstances and the exceptional features of the risk known to both parties. The view of the Circuit Court of Appeals that "perils of the sea" has an absolute meaning and may not be varied by the knowledge of the parties as to the circumstances and must be maintained stiffly in favor of the insurance companies and against the insured, is not necessary or reasonable. The variation in the significance of "seaworthy," as shown by the above authorities, when caused by exceptional circumstances known to both parties, applies as well to the meaning of perils of the sea as to that of seaworthiness. The two terms in such cases are correlative terms. *Klein* v. *Globe & Rutgers Insurance Co.*, 2 F. (2d) 137, 139, 140.

The Circuit Court of Appeals distinguished *Klein* v. *Globe & Rutgers Insurance Company*, *The Farmers' Feed Company* v. *The Insurance Company* and *Thebaud* v. *Great Western Insurance Company*, and 4 Joyce on Insurance, Section 2159, as follows:

"Recovery was allowed in each of those cases on the actual contract which was held to be different from the contract evidenced by the insurance policy. It was merely

held that effect should be given to the actual contract. The facts in this case do not warrant the conclusion that appellant bound itself by its conduct or by any agreement to accept the risk of unseaworthiness."

We find ourselves unable to follow this distinction. In all these cases the recovery was on the contract, and the question was of the construction of the contract. Its construction was affected necessarily by the special circumstances surrounding the contract known to both parties and acted on by them in charging and paying an increased compensation for the risk run. The circumstances in this case are very like those shown in the cases cited. They certainly justify the conclusion to which we have come.

*The judgment of the Circuit Court of Appeals is reversed.*