## THE DALZELLITE.

### THE W. F. DALZELL.
### THE FRED B. DALZELL, Jr.

#### SUN OIL CO. v. DALZELL TOWING CO., Inc.

District Court, S. D. New York.

Nov. 25, 1930.

Duncan & Mount, of New York City (Frank A. Bull and Charles R. Millett, both of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for respondent.

KNOX, District Judge.

The trial of this suit developed the following state of facts:

On May 15, 1925, the steamship Sabine Sun, laden with oil, was off Stapleton, Staten Island. She was desirous of delivering the cargo at the dock of Texas Oil Company, at Bergen Point, N. J. On the preceding day, Leopold A. Turnbull, assistant marine superintendent of Sun Oil Company, in the ordinary course of his duties, had telephoned to respondent, and requested that tugs be sent to the Sabine Sun to take her to Bergen Point. Realizing that the waters leading to that destination were shallow at certain points, the libelant's representatives told respondent that the vessel would be lightered so as to bring her draft to twenty-four feet. When this had been done, the tug W. F. Dalzell proceeded alongside the steamer. The tug captain went upon the lighter's bridge to act as pilot. The tanker, using her own steam, accompanied by the tug, got under way. When the vessels were opposite St. George, they were joined by the tug Dalzellite. The three boats then proceeded through the Kill von Kull, and off Port Richmond, the tug Fred B. Dalzell, Jr., became

a part of the flotilla. Her master, Howard B. Fort, ascended the bridge of the Sabine Sun to assume the role of pilot, relieving Captain Bennett of the W. F. Dalzell, who nevertheless remained on board. Turnbull, the captain of the tanker, his third officer, and a quartermaster were also there. The weather was clear, the tide was within an hour of high water, and the wind was such that it played no part in subsequent events.

In passing, it should be observed that Fort, in order to equip himself with knowledge of conditions existing along the channel through which the steamer was to go, and which was in process of being dredged, and which was also unmarked with the usual aids to navigation, had visited the locality on the previous day, and taken soundings of the depths of water through which the steamer was to move. He had also communicated with the engineers of the War Department, in an endeavor to procure a blueprint of the work then in progress. This he secured. He also bought a copy of the latest chart of the waters. These aids, it is said, were not of a character to furnish him with accurate knowledge of what he might expect to find. As a result, Fort was apprehensive of his ability to get the vessel to her destination in safety. In fact he states that he explained the difficulties of the situation to Turnbull, and that, had the latter not remarked that he would "take the risks" and would be very much pleased if the job were executed as well as when it was last performed, he (Fort) would have returned the ship to anchorage. Turnbull denies that any such conversation occurred. Whatever may be the truth as to this feature of the case, the tanker, using her own steam, with a tug on either quarter, and one forward on the port side, proceeded on her way. In navigating the vessel, Fort took his ranges from a gas tank and a street end on Staten Island that he had used successfully on former occasions when taking vessels into Newark Bay. On this trip, however, as he was rounding about Bergen Point, on an angle of 90 degrees to starboard, the forward part of the Sabine Sun struck against some obstruction, and went fast aground. She so remained for about three hours, during which time she was lightened of a part of her cargo. When this had been accomplished, the vessel floated, and, under the pilotage of Captain Fountain, who was brought aboard, was taken to her dock. The grounding of the vessel injured some of her plates, and this suit is designed to recover the resultant damages.

Captain Fountain testifies that, when he went on board the steamer, she was out of the channel and I so find. When Fountain took charge and the steamer had been floated, he backed her into the Kill von Kull, and then maneuvered in such fashion that the turn in the channel, which Fort had apparently missed, was made without trouble. On reaching the dock of the Texas Oil Company, Fountain returned the vessel to Fort, who warped her into the berth.

Upon the facts as they have been recited, it is clear that libelant can have no recovery against the tugs, or any of them. None of them contributed to the accident in any way, shape, or form. For this reason, each of them must be exonerated. The Edward G. Murray (C. C. A.) 278 F. 895.

But, as for the respondent's part in the occurrence, somewhat different considerations must receive attention.

The first of these is that the representative of the owners of libelant, paid, or rather gave, the sum of $15 to Fort upon the completion of his work in handling the vessel. This payment, I think, should be regarded as a mere gratuity, and in no way determinative of the question of respondent's liability in the premises. See The Edward G. Murray, supra, and The Procida (D. C.) 243 F. 251.

So far as the conversation, in which Fort says that Turnbull assumed the risks incident to the navigation of the Sabine Sun, is concerned, I am of the belief that it should not, granting that it took place, affect the question of liability. There is an element of the case that renders Fort's disclaimer of responsibility, if he actually made it, more or less academic. It is that respondent's engagement with respect to the Sabine Sun was qualified by a claim appearing upon its rate sheet, and bills for services, which reads as follows:

"When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed that said tugboat captain or licensed pilot becomes the servant of the owners of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents or charterers shall be liable for any damage resulting therefrom."

Copies of respondent's "Pro Forma Towage Rates and Contract with Dalzell Towing

Company, Inc.," containing the above-quoted clause, were forwarded to libelant's office on November 15, 1923, December 28, 1923, and June 10, 1924, in response to inquiries concerning towage charges. One of such copies was received by Mr. Innis, a clerk in libelant's office; another by the office manager of libelant's marine office; and a third by Mr. Turnbull himself. In a letter which accompanied the rate schedule which was sent to libelant and received by Innis, the respondent said: "We are attaching herewith a towage schedule and would like to call your attention to the last paragraph marked with an 'X.'" This reference was to the pilotage clause set out above.

Respondent usually handled the vessels of libelant in this port, and, inasmuch as the pilotage clause is printed on the bills for services rendered by respondent, to say nothing of the attention which was drawn to the clause by respondent's letter, there can be no doubt that libelant should be charged with knowledge of the terms on which respondent offered to furnish towing services. So far as appears, libelant never informed respondent that it would not accept towage services on the terms proposed, as was the fact in McWilliams Bros., Inc., v. Davis, Director General (C. C. A.) 285 F. 312. Nor was the existence of the pilotage claim only brought to the attention of a superannuated and inactive employee of the respondent, as was done in G. Robitzek & Bro., Inc., v. Davis, Director General (C. C. A.) 296 F. 107. On the contrary, the responsible officials had every opportunity to know of the limitation contained in the terms of respondent's offer to undertake engagements such as it assumed for libelant. While Turnbull denies that he had ever actually read the clause prior to the trial, he does admit that he had "heard of it." The facts here present bring the case within the rule of law as announced by the Circuit Court of Appeals in this circuit in The Oceanica, 170 F. 893; in Ten Eyck v. Director General (C. C. A.) 267 F. 974, and in The Cutchogue (C. C. A.) 10 F.(2d) 671, to the effect that, under circumstances such as those now before me, the tow assumed the risk of injury. The principle of these cases must here be recognized. Appreciation is had, of course, of the circumstance that the law of this circuit on the question now before me is not in harmony with that followed by the appellate courts of several other circuits, and may indeed be in conflict with the pronouncement of the Supreme Court in The Syracuse, 12 Wall. 167, 20 L. Ed. 382. It is true, nevertheless, that the latter court refused to review the Ten Eyck Case, supra, and there is nothing which indicates that the appellate court of the circuit is inclined to change its previous rulings on the question. Until that change be made, I shall follow the law as it has been here repeatedly declared. As for the contention that the Supreme Court cited its decision in The Syracuse as a basis of its conclusion in The Wash Gray Case, 277 U. S. 66, 48 St. Ct. 459, 72 L. Ed. 787, it needs only to be remarked that the facts recently before the court in that litigation are easily and fundamentally distinguishable from those in the case at bar.

From what has been said, it would seem as though libelant cannot escape the binding effect of the decisions of the local Circuit Court of Appeals, to which reference has been made, even though it be assumed that Fort was guilty of negligence in getting the Sabine Sun out of the channel and onto the ground. By reason of my conclusion, I need make no finding on the question of Fort's negligence.

The libels are dismissed.