## NORTH RIVER BARGE LINE v. CHILE STEAMSHIP CO. et al.

### The MARY L. McALLISTER.

No. A 18841.

United States District Court
E. D. New York.

May 6, 1953.

Purdy, Lamb & Catoggio, New York City, by Edmund F. Lamb, New York City, advocate, for libelant.

Macklin, Speer, Hanan & McKernan, New York City, by Gerald J. McKernan, New York City, advocate, for respondent.

Foley & Martin, New York City, by Christopher E. Heckman, New York City, advocate, for respondent-impleaded.

BYERS, District Judge.

The libelant's wooden deck scow Creek sustained heavy ice damage while being towed by the tug Mary L. McAllister, off Hastings, New York, on the night of March 5, 1948. She was under charter (via Christie Scow Corporation) to respondent Chile, and the latter has impleaded the tug and her owner, upon the theory that liability if any was caused by improper towing by the McAllister tug, which had been engaged by Chile. The nature of that engagement is one of the litigated issues, as well as the method of performance by the tug.

The legal character and status of the parties and ownership and operation of the affected vessels are not in dispute; nor

is the fact and extent of damage, nor the good and seaworthy condition of the Creek when she went on charter. In that connection it is agreed that she was not ice-sheathed, but no one seems to assert that fact to have been an undisclosed condition so far as Chile was concerned, when the usual oral harbor charter was entered into as stated, on February 20th preceding the happening.

Since the foregoing recites undisputed matters, the findings will be addressed only to disputed questions of fact.

### Findings.

1. The Creek is a wooden deck scow 120 x 35 x 10 (she had a 45° overhang at each end) and, being under charter as stated, was taken in tow light by the respondent's-impleaded tug Mary L. McAllister (88.7 x 22 x 9), from alongside the dock of Anaconda C. & C. Co., at Hastings on Hudson on March 5, 1948 at about 9:00 P.M.

2. The respondent Chile Steamship Company, to be called Chile, is a subsidiary of Anaconda Copper Company, of which Anaconda C. & C. Co. is also a subsidiary. (Note: This was stated informally and is assumed to be true; if challenged, however, this finding will have to be reconsidered.)

3. When the Creek was sub-chartered from Christie Scow Corporation, she was under charter to it by the libelant owner.

4. There is no evidence that the rights of the owner of the Creek were intended by the parties to have been other than if the charter had been entered into between libelant and Chile.

5. The Hudson River off Hastings and down as far as Yonkers, was covered with floating ice, which tended to solidify near the shores, but in the middle of the river, waterborne traffic had moved for not less than four days prior to March 5.

6. On or about March 4, 1948 Chile issued orders to McAllister to tow two scows up to the Anaconda C. & C. plant at Hastings, and the order was executed and the two scows were duly delivered about 8:00 P.M. on March 5, 1948.

7. That towing was astern in tandem through ice from about Yonkers to Hastings, and was accomplished without incident.

8. At the time the order was given, so far as the evidence shows, there was no discussion with the McAllister Line as to the ice conditions in the Hudson River off Hastings.

9. There were two scows lying at the shoreside dock or bulkhead of the Anaconda C. & C. Co., namely the said scow Creek which was light, and the scow Utah which was laden to about two-thirds of her 650 tons capacity with copper products and which was sheathed for protection against ice.

10. The McAllister tug took those two scows in tow about 9:00 P. M. March 5, for return to New York.

11. The anticipated delivery of the scows at New York would have been for account of Chile, and pursuant to its customary practice of giving instructions.

12. Only the Utah was so delivered.

13. The tow was made up so that the scows were alongside the tug, the Creek to starboard and the Utah to port.

14. This make-up was chosen by the tug's captain to promote ease in handling as the tow proceeded through the ice, and to prevent possible over-riding by the light scow Creek of the partially laden and therefore lower-lying Utah, had the latter been the hawser boat in a tandem tow astern of the tug.

15. Neither Higgins, the scow-master of the Utah, nor Olsen of the Creek, nor Kennedy the crane operator, who was stationed on the bulkhead where the Creek was made fast, protested to the captain of the tug concerning the manner of making up the tow, as stated in the preceding finding.

16. The Utah, being sheathed, would have been properly chosen as the hawser boat if a tandem make-up had been effected.

17. As the tow proceeded toward the center of the river, heavy ice was encountered and at a distance from the dock of about one-half mile, it was discovered by

the scowman of the Creek that the hull had been broken by cakes of ice, water and cakes of ice were entering, and the scow was in danger of sinking. He promptly notified the captain of the tug, who cast loose the Utah, put a stern line on the Creek and towed her in that shape back to the dock, where she sank decks-to, by reason of the ice damage, so sustained.

18. The towing arrangements between Chile and McAllister as to the New York and Hastings run were of long standing, and the question of responsibility for ice damage having arisen, the following letter from the latter to the former established their mutual understanding and governed the movement on March 5, 1948 here under consideration:

"January 14th, 1947

"Mr. J. McKinlay, Vice President,
Chile Steamship Company, Inc.
25 Broadway
New York 4, New York

"Gentlemen:

"We wish to notify you that this company is forced to decline liability for any damages sustained by your Scows and lighters and their cargoes which may result from or be caused by towing and navigating in ice while enroute from New York Harbor to Hastings on the Hudson, New York.

"It is understood, however, that such declination of liability does not free us from other liabilities customarily assumed by the tower.

"We shall keep you advised of the conditions in the river and if we are ordered to tow in ice we shall exercise all due diligence in the towing of your equipment. However, whether negligent or not, if any damage is sustained in towing in ice we must be released of liability on the basis stated above.

"Yours very truly,
"McAllister Lighterage Line, Inc.
"James P. McAllister, Vice-Pres."

19. There was no such change in the ice condition of the Hudson River off the said bulkhead between the arrival of the up-bound tow of the same tug at about 8:00 P. M. and the start of the down-river trip at about 9:00 P. M. as to indicate to the captain of the tug that he should request the recall of the orders under which he was about to proceed with the two scows, the one light and the other laden.

20. There was an ebb tide of a strength of one mph prevailing, which means that there was somewhat of a flood set at the east shore along the face of the bulkhead.

21. The tow did not move at uniform speed in leaving the bulkhead; start was at slow speed and this was increased intermittently but there is no proof that at any time prior to the events related in Finding 17 the engines were put at full speed ahead.

\* \* \* \* \* \*

The situation, as outlined in the foregoing findings, is the basis for the contentions for Chile now to be examined.

 Primarily it is urged that the letter embodied in Finding 18 should be disregarded and treated as though it had never been written. The argument is not so stated but not otherwise could the communication be ignored.

It is necessary to dispose of this argument at the outset. Reliance is had upon the theory that a general release running to the tower is void, as decided in The Syracuse, 12 Wall. 167, 79 U.S. 167, 20 L. Ed. 382, and subsequently referred to in Compania de Navegacion Interior, S. A. v. Fireman's Fund Ins. Co., 277 U.S. 66 at page 73, 48 S.Ct. 459, 72 L.Ed. 787; also Sun Oil Co. v. Dalzell, etc., 287 U.S. 291 at page 295, 53 S.Ct. 135, 77 L.Ed. 311; The Oceanica, 2 Cir., 170 F. 893; and Petterson Lighterage & Towing Corp. v. The J. Raymond Russell, D.C., 87 F.Supp. 467 at page 470.

It will suffice to observe that the terms employed in this letter do not purport to assert general exemption from a tower's liability. On the contrary, it says in part:

"It is understood, however, that such declination of liability does not free us from other liabilities customarily assumed by the tower."

Thus it is clear that orders for towing through ice given by Chile to McAllister after January 14, 1947 were issued with

the understanding that responsibility for carrying those orders into effect was assumed by Chile but that McAllister recognized the requirement to "exercise all due diligence in the towing of your equipment."

No good reason is suggested for depriving these parties of the right freely to contract according to their own notions, the McAllister Company not here being a public carrier.

Something is sought to be made of the undertaking by McAllister to keep Chile advised of the conditions in the river which introduces the third paragraph of the letter. Since this damage was occasioned by ice in the Hudson in the vicinity of the Anaconda plant at Hastings and not near the City of New York, it is evident that it would be unreasonable to expect of McAllister an undertaking to advise Chile of a condition which confronted its associated enterprise at a distance of thirty miles or so from the place where both of these parties had their offices.

One of the difficulties in disposing of a five year old controversy arises from the inability of witnesses to remember such casual and trivial day by day happenings as telephone conversations concerning a prosaic and conventional transaction as the movement here under examination, and I am not at all satisfied that the witness Travis, called by Chile, had any recollection on the subject at all; his testimony was mainly as to what would have happened and what was likely to have occurred, etc., in connection with the giving of this order.

This means that Chile is not to be released from the responsibility resulting from its acceptance of the said letter, unless the evidence establishes that McAllister is equally responsible by reason of having failed to exercise the "due diligence" undertaking above quoted. It therefore becomes necessary to consider whether it should be held that the tug was negligent in undertaking the movement at all in spite of the orders which had been issued; and if not, whether the make-up of the tow is to be criticized and the maneuvers, so far as they are made clear by the evidence.

It will be recalled that the captain of the tug had towed two scows up the river and into the slip which divides this breakwater, one hour before this departure; this means he had established a path from the center of the river to the slip, and it was that path in which he expected to move the downbound tow; while the opening was probably about as broad as the widest of the two scows that he had brought from New York, it was nonetheless a changing channel into which it cannot be said that he must have known that entrance would be futile with these two scows alongside his tug; this for the reason that the ice was not solidly frozen from shore to shore although it indeed sufficiently impeded navigation to cause him to say on the witness stand, that he would not have undertaken the movement had he not been under orders; this of course is an expression of opinion uttered five years after the event.

The question of the make-up of the tow is more serious and Chile relies upon, for instance, The Bern, 2 Cir., 213 F. 630, The Mary C. Black, D.C., 40 F.2d 304, and The Bear, D.C., 11 F.2d 607, among others, to establish that it was negligent for the McAllister to take those scows alongside rather than to tow them astern on short hawsers.

Of course it cannot be said that it is a principle of law in the admiralty that towing alongside through ice establishes negligence, but the cases relied upon by Chile are all consistent with the view that towing astern is the preferred and usual method to be employed, and casts somewhat of a burden of plausability to vindicate such an arrangement as was here employed.

Carpenter, the captain of the tug, believed that there was no other way of making up this tow under the circumstances:

"I say that (there was no other method of making up the tow) due to the ice conditions. If it were not for the ice conditions we could have made up the tow right at the dock, but I didn't want to maneuver around the dock with those scows and the ice the way it was. I wanted to get out in the river where I had more of a chance with the ice.

In other words, I was fearing that maneuvering around the dock with the scows there, the ice had nowhere to go but just right into the side of the scow; due to the dock being there, there is no give."

Being asked whether the difference in draft of the scows would present a hazard in navigating a tow made up in tandem, astern, he said:

"Well, coming down the river, coming down in fair tide, you would be coming down at a pretty good speed, and if you suddenly encountered a solid stretch of ice, your tug would stop suddenly, whereby your tow would come right up on top of you and hit you in the stern, causing damage from the scows, not the ice.

"Q. And then what would occur between the first boat and the second boat under those conditions, when there is a difference in freeboard? A. Well, when one is high and one is low with the freeboard one would override the other."

There is no expert testimony to the effect that Carpenter's understanding of the situation was deficient or that the make-up of the tow as he believed necessary under the conditions shown, was negligent or fell short of the requirement to exercise due diligence according to the terms of the letter above quoted; at most it could be criticized in the light of that infallible guide, ex post facto wisdom.

It is to be remembered that employment of an unsheathed scow in ice filled waters was the exercise of judgment by Chile and not McAllister.

If the foregoing has been correctly reasoned, the result is that the impleaded respondent McAllister, etc., is not shown to have failed to perform its complete undertaking with the Chile Company in accordance with the special agreement under which this towing operation was conducted.

Perhaps comment should not be omitted concerning the attenuated assertion that there is present in this case a difference between the duties resting upon Chile as a sub-charterer from Christie, and those which would have pertained to it had the charter been to it directly from the libelant. There is no room for such a contention. Seaboard Sand & Gravel Corp. v. Moran, etc., 2 Cir., 154 F.2d 399; Seaboard Sand & Gravel v. Elmhurst, 2 Cir., 159 F.2d 860; and The C. W. Crane, 2 Cir., 155 F.2d 940.

#### Conclusion.

The libelant is entitled to the usual interlocutory decree against the respondent, with costs; and the impleading petition against the respondent, McAllister Lighterage Line, Inc. and the Tug Mary L. McAllister, is dismissed, with costs.

Settle decree.