## MONK v. CORNELL STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit.   May 13, 1912.)

### No. 195.

1. SHIPPING (§ 41*)—CHARTERS—CONSTRUCTION—DEMISE OF VESSEL.

A charter of a coal boat, without motive power, for a year at $5 per day, which included a watchman or caretaker furnished by the owner, who, however, had nothing to do with the movements of the boat or its loading or discharging, was a demise of the boat by which the charterer became the owner pro hac vice.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 149–155; Dec. Dig. § 41.*

Demise of vessel, see note to The Del Norte, 55 C. C. A. 225.]

2. SHIPPING (§ 54*)—INJURY TO TOW BY ICE—LIABILITY OF TUG.

The time charterer of a coal boat, who was the owner pro hac vice, had urgent need of the coal with which the boat was loaded to keep its power plant at Bay Ridge in operation and directed respondent, a towing

company, to tow the boat there from Hoboken where she was lying, although both parties knew there was serious danger to her from floating ice. Respondent objected, but finally undertook the towage with two tugs. The passage was made, and the boat docked, but she soon after filled and sank because of injuries received from the ice. *Held* that, under the circumstances, respondent was only liable to the owner of the boat for negligence in the towing, and, no negligence being shown, the owner could not recover from it any part of the damage sustained.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Thomas Monk, Jr., as owner of the coal boat George T. Monk, against the Cornell Steamboat Company. Decree for libelant (175 Fed. 271), and respondent appeals. Reversed.

Amos Van Etten, for appellant.

Carpenter & Park (Samuel Park, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. February 9, 1908, the coal boat George T. Monk, having a square bow and stern with slightly rounded corners, generally called a box, was lying at Hoboken laden with 735 tons of coal destined for the power house of the New York Edison Company at Bay Ridge, and the respondent was under contract to tow her there. The Edison Company was charterer of the boat for one year from July 1, 1907, for the sum of $5 per day. The libelant maintained his boat, and kept a man aboard whom he paid, but the Edison Company loaded and unloaded her, and had entire control of her movements, and paid for all towage. The boat had lain waiting at Hoboken for two days on account of ice in the river which had been blown by the wind over to the Bay Ridge side of the upper bay. The coal being absolutely necessary for its power plant, which would have had to shut down without it, the Edison Company insisted upon the respondent's towing her to destination. The respondent's despatcher said the ice was bad, that he did not want to tow in it, and that more than one tug would be required, to. which the superintendent of the Edison Company replied that he must have the coal even if it took six tugs to take the boat to destination.

Accordingly the respondent's tugs Bavier and Williams took the boat in tow. When they arrived opposite the Edison Company's power plant, they found that the broken ice had frozen solid for a quarter of a mile or more from shore into the Bay. Thereupon the Bavier, leaving the boat in charge of the Williams, broke up a channel through the ice as she went in, and widened it as she came out. Then she started ahead with short hawsers to each corner of the boat, the Williams following astern with a line to the boat's stern, so as to be ready to reverse her engines if the Bavier fetched up in the ice, and prevent the boat from running upon her. The boat was taken in this way apparently in safety to her pier, but shortly after

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sank as the result of water entering through holes made at each corner of her bow by the ice.

The specific charge of negligence in the libel was that the Bavier, by lengthening her port hawser, had caused the boat to sheer to port so as to damage her port bow against the ice. We cannot see how the shortening of the port hawser would cause the boat to sheer to port. At all events, the district judge rightly held that this charge was not made out, and it is abandoned by the libelant.

The negligence relied upon is that the Bavier did not break up a wide enough channel. The district judge found that the channel was wide enough, but that the bow of the boat, being seven feet wider than the tug, was bound to come in contact with the broken ice necessarily remaining in it as she followed the tug. He thought the case covered by the Phœnix (D. C.) 143 Fed. 350, where the boat towed was only allowed half damages because her master acquiesced in being towed through the ice, but he also thought the libelant entitled to recover in full, because the request to tow on this occasion came not from the libelant (the owner), but from the charterer.

Another ground of negligence relied upon is that both tugs should have towed ahead, side by side, and so better protected the bow of the boat from contact with the ice. The master of the Bavier said that this would not have been safe, because, if they had fetched up in the ice, the boat would have run upon them and done them injury. This was a matter of judgment, and we cannot say that the judgment exercised by the master was wrong.

[1] We think the real question in the case is whether the Edison Company was owner pro hac vice and its orders to the respondent as to the navigation of the boat the same as if given by the owner. That very learned and experienced admiralty judge, Addison Brown, held that time charters of boats without motive power, even though in charge of a care keeper for the owner make the charterer owner pro hac vice. The Daniel Burns (D. C.) 52 Fed. 159:

"But upon the proof as to the hiring of the boat, I do not think the facts show that either the Burns' or her owner was liable for a mere deficiency of grain found on unloading. There was no charter of the boat in the ordinary sense. The boat was merely hired by the libelant, in accordance with a very common practice, for an indefinite time, at the rate of $2 a day, for use by libelant in storing or carrying its grain about the harbor; that price to be paid for each day that any cargo was aboard. The boat, so far as respects loading and unloading, her navigation, and the delivery of cargo, was to be subject wholly to the orders and control of the libelant. The price of $2 per day included a man, who was called a captain, who stayed upon the boat, and whose business it was to attend to her and keep her pumped out as necessary. But this man had nothing to do with the loading, trimming, or unloading of the cargo, nor with the navigation of the boat; and the canal boat had no motive power of her own. Whatever navigation there was, was to be done exclusively by the libelant. When any cargo was to be delivered, the libelant would cause it to be towed; and the cargo, or so much of it as might be sold, would be transported by the libelant to the place where the buyer wished to remove it. * * * The boat was in legal effect delivered to the libelant. The libelant, in putting its grain on the boat, did not part with the possession of the grain, nor deliver it to the boat owner. On the contrary,

the boat was delivered to the libelant, and was legally in its possession, custody, and control. The libelant was owner pro hac vice."

[2] We are content to follow this. The effect of the charter was to give the charterer entire control of the movements and navigation of the boat and the fact that the owner paid the man in charge, who was only a watchman and caretaker, is not sufficient to prevent the charter from being a demise of the boat.

The question then is: What effect should be given to the orders of the charterer, the Edison Company? If a tug tows a boat in her charge through dangerous ice without any consultation with her master or owner, the tug and owners will be solely responsible for damage to the boat. The Rambler (D. C.) 66 Fed. 355. If in such case the tug tow the boat with the consent of her master or owner, the tug and owners will be only liable for half the damages the boat may sustain. The Phœnix (D. C.) 143 Fed. 350. If in such case the master or owner of the boat towed agrees to take the risk of towing in the ice, the tug and owners will not be liable for towage in ice, but only for negligence in so towing. The Packer (D. C.) 28 Fed. 156.

When the boat towed assumes all the risks of towing, it assumes the risk of the tug's negligence, as we have held in The Oceanica, 170 Fed. 893, 96 C. C. A. 69, because, the tug not being an insurer or common carrier, want of ordinary care and prudence is all the tug and owners are responsible for. There is nothing else for the contract assuming all risks to operate on. Of course, if at the outset of a voyage the master or owner of a boat to be towed agrees to take a particular risk, as of towing through ice or of starting in the face of an impending storm or in fog, that contract would have something to operate on, without assuming the risk of the tug's negligence in doing the towing. Such was the case of the Packer, supra.

As the respondent unwillingly and only upon the insistence of the owner pro hac vice undertook the towing through ice known to be dangerous, we think it would only be liable for any negligence in the towing. There was no negligence. The accident happened, as the district judge found, because it was dangerous to tow this boat through the ice then prevailing, even though due care were exercised. The libel should have been dismissed.

Decree reversed, with costs.