## NEW YORK & N. J. TRANSP. CO. v. PAYNE, Director General of Railroads.

(District Court, S. D. New York. July 16, 1926.)

**1. Shipping ⬤⟿62.**

Although barge master is not much more than caretaker, he is vested with certain authority as agent of owner to bind him in contractual relation.

**2. Shipping ⬤⟿62—Release by barge master of liability of Director General in war time for damage to coal barge by floating ice held not to relieve Director General from liability to owner.**

Director General of Railroads *held* not relieved from liability for damage to coal barge, resulting from being towed through floating ice, by reason of release signed by barge master, in view of fact that it was during war period, at time when there was urgent demand for coal, and Director General had it within his power to utilize any or all facilities, which would have made it practically impossible for barge master to have prevented boat from being taken out.

**3. Towage ⬤⟿15(2).**

Evidence *held* not to show that tugs exercised proper degree of care and prudence in attempting to tow coal barges, when harbor and bay were incumbered with ice.

**4. Towage ⬤⟿11(1).**

Private owners should not be compelled to bear loss incurred by effort of government to get coal towed to New York during war period, when there was urgent demand therefor.

In Admiralty. Libel by the New York & New Jersey Transportation Company against John Barton Payne, Director General of Railroads. Decree for libelant.

Decree affirmed 13 F.(2d) 483.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for libelant.

Bigham, Englar & Jones, of New York City (T. Catesby Jones, of New York City, of counsel), for respondent.

WINSLOW, District Judge. This action is brought for the loss of the Florrie Moore, with her cargo of coal, by collision with ice on the early morning of January 12, 1918, at about Carteret, N. J., in the Kill von Kull, between the Staten Island and New Jersey shores. This boat was one of seven coal barges, being the fourth in single file.

At about 1 a. m., January 12, 1918, the steam tugs Ganoga and Westmoreland, of the Lehigh Valley Railroad, operated by the Director General of Railroads, started with their flotilla from Perth Amboy, en route to New

13 F.(2d)—31

York. The Westmoreland was the helper tug. The libelant contends that the weather and ice conditions were such that it was negligent for the respondent to tow the boats, and that this negligence, coupled with his alleged further negligence in towing, and his failure to properly protect the boat from drifting ice, justifies a recovery against the respondent.

At the outset, it is necessary to determine a preliminary question, which, if determined in favor of the respondent, will end the case. On behalf of the respondent, there was offered in evidence a paper, signed by the master of the Florrie Moore, as follows:

"Form T 377–1–17–1M.

"Perth Amboy Towing Line.

"Perth Amboy, N. J., Jan. 11, 1918.

"Towboat: Florrie Moore. Loaded with 527.19 Tons Coal, from P. Amboy to Sugar House, Jersey City, $41.40 Charge J. W. M., D. S. O.

"It is especially understood and agreed that neither the Lehigh Valley Railroad Company, and/or Lehigh Valley Transportation Company, nor any of their vessels, shall be liable for damage and/or loss which may be sustained by the boat Florrie Moore, or the cargo therein in consequence of the said boat being towed through or against floating ice.

"[Signed] John Mosk."

[1] There is no doubt that the barge master is, at times, not much more than a caretaker of his barge, but of necessity he is vested with certain authority, as the agent of the owner, to bind him in a contractual relation. In the recent case of The W. H. Baldwin, 271 F. 411, it was held that the barge master "was the agent of the owners, so far as the cargo of the barge was concerned." It was contended that the barge had been improperly docked, or not docked in a proper position or in a proper place. The court said, however, in considering the barge master's authority, that he had acquiesced in leaving the barge in the position in which the tug left her, and therefore that the owner, the barge master's principal, "took the risk of allowing the barge to remain in the position she was in when the tug had fulfilled its service."

I can conceive of a state of facts under which the court would be fully warranted in concluding that a release by the barge master would relieve the tug from liability resulting from an accident caused by floating ice. In the instant case, however, there are unusual, and, indeed, quite extraordinary, circumstances which must be taken into account. In the first place, the respondent was acting un-

der the paramount authority of the United States government, operating or directing the operation of various railroads and carriers. War conditions had made this both necessary and desirable. At this particular time, most unusual weather conditions had obtained in and about the harbor of New York, and ice was in evidence, according to the record, more than for many years. The urgent demand for coal, caused by weather conditions as well as the emergency of war, demanded that coal be transported and delivered, even though a certain percentage of disasters might result from defiance of weather conditions, which, at normal times, would have precluded prudent navigators from setting forth. To say that, under the compulsion of these conditions, the signing of the waiver by the barge master absolved the respondent from liability, does not appeal to the court.

[2] I am of the opinion that the signing of the so-called release referred to was a mere gesture in the instant case. The barge master could hardly have refused, in view of the fact that the Director General had it within his power to utilize any or all of the facilities of various railroads and their water transportation facilities, and that such arbitrary power was not only conferred, but recognized as necessary, and would have rendered it difficult, if not impossible, for the barge master to have prevented his boat from being taken out whenever directed. See opinion by Hough, J., Cleary Bros. v. Director General of Railroads, May 1, 1919.

This conclusion does not conflict with the rule laid down in Monk v. Cornell Steamboat Co., 198 F. 472, 475, 117 C. C. A. 232, 235. In that case the court said that, "if * * * the master or owner of the boat towed agrees to take the risk of towing in the ice, the tug and owners will not be liable for towage in ice, but only for negligence in so towing." But, in order to apply the rule of the Monk Case, it must appear that the owner has agreed to take the risk, either by his own personal action or by the action of a duly authorized agent, acting under normal conditions within the scope of his authority.

I do not believe that in the instant case, under the circumstances, which, while not amounting to duress, were certainly persuasive, the barge master represented the owner in the sense indicated by the rule cited, nor yet was he acting at that time within the scope of any authority properly vested in him.

The next question to be considered is the measure of responsibility assumed by the respondent in proceeding out under weather conditions as they existed, and the conduct of the tugs and their navigators, operated under orders of the Director General of Railroads.

[3] The days in January preceding the 11th of that month had been abnormally cold, and the Harbor, the Lower Bay, and the Kills were incumbered with ice. An ice breaker had been sent down by the Railroad Administration to open the channel. The weather on January 12th had moderated somewhat, but there was a very high wind on that day from E. by N. E. Capt. Chase, a witness called on behalf of the libelant, testified that he had been in charge of the coal-towing operations for the Pennsylvania Railroad for 55 years, and was in charge of that job in January, 1918; that the Reading and Pennsylvania and Lehigh Valley Railroads, operated by the respondent, were towing coal through the Kills at that time; that on that day the Pennsylvania Railroad had lost four boats at the Great Beds Light, due to ice conditions; that the ice condition in the Kills on January 12, 1918, "was very heavy." "It had never been worse in my experience of over 50 years." He was asked the following question and made answer thereto:

"Q. If you had had a free rein, and had not been under the paramount orders of the Railroad Administration, would you have sent the tow up on that day? A. Not on that night; no."

He says that the government endeavored to keep the channel open, and "never stopped battling at it the whole winter." The record shows that the east wind steadily increased from 15 miles to 70 miles per hour, attaining a maximum velocity of 84 miles an hour at 4:47 on the morning of the 12th of January.

Capt. Scott, in substance, testified that, while the wind conditions did not bother them in the sheltered Kills, yet, so far as the ice was concerned, the Kills were worse than the open waters of Raritan Bay. It is in evidence that on the same day a boat operated by the Reading Railroad was damaged so that she sank the following morning. It is significant that the tug of the Lehigh Valley Railroad towing the barges in the case at bar took approximately 2½ hours to reach Carteret, where the barge sank, although the trip ordinarily would take only one hour, although there were two tugs to pull seven boats. One witness testified that the Reading tow took 26 hours to get to Pier B, Jersey City, although ordinarily six hours would be ample time. Other facts might be quoted from the record,

but it is quite apparent that the ice conditions were worse than in many years.

I am not satisfied that the tugs exercised that care and prudence under the circumstances which was their measure of responsibility. Capt. Dolan, of the tug Ganoga, testifying for the respondent, stated that, in his opinion, it was all right to start the tow that night; that the wind was blowing 40 to 50 miles an hour; that there was no ice in the channel; that there was no trouble after leaving Perth Amboy at all. He says that the first ice encountered was "when we struck the boat Florrie Moore at Carteret," and that the first intimation that the Florrie Moore was in trouble was when the captain on the boat in the head tier shouted that the ice had hit the Florrie Moore. This was about 3:30 a. m., not long before the wind had reached its maximum. He stated that he considered the safer way to tow boats through the ice was to have them one behind the other, as was the case with the Florrie Moore. He says that he "knew the ice broke off Staten Island shore and came over and hit her."

It is manifest that the wind, blowing violently, as it was, would bring about exactly this result, and this witness had admitted knowing ice conditions prior thereto; so it is quite apparent that he was fully aware of the grave peril of towing, but the paramount authority of the Director General and the government's necessity demanded that at all hazards the coal be moved. Again, under cross-examination, this witness stated that the ice extended all along the Staten Island shore and that he saw it. It is quite clear in the mind of the court that this witness knew perfectly well the hazardous conditions. His statement to the contrary was negatived by his own responses, together with his attitude when admonished by the court.

[4] Paraphrasing the remarks of Judge Hough in a similar case concerning liability in time of war, the liability arising on the very night in question, I do not believe that it is the law that private owners should be compelled to bear the loss incurred by this effort to get the coal towed through to New York on the night of January 11–12. If the tug captains did not know the extreme hazard, they ought to have known, and I believe they did know. The paramount necessity of the government demanded that the effort should be made, even though heavy toll might be required.

The usual interlocutory decree will be made in favor of libelant, and will be settled on notice.