## THE LAWRENCE J. TOMLINSON.
### THE CORNELL NO. 21.
#### No. 13929.

District Court, E. D. New York.
Sept. 28, 1934.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for claimant.

BYERS, District Judge.

The owner of the barge Lawrence J. Tomlinson seeks to recover the damages sustained by it while in a field of ice, in the Hudson River, near Catskill, N. Y., the barge being in tow of the claimant's tug Cornell No. 21 from Jersey City to Troy, during the month of February, 1933.

The libelant asserts that the barge was damaged as the result of striking the ice and also because of overriding the tug, which was then towing on short hawsers, when the tug was brought to a sudden stop by ice barriers.

The specifications of negligence in the libel in addition to the general ones are:

"4. In allowing the barge 'Lawrence J. Tomlinson' to ride up on the stern of the tug;

"5. In backing into the bow of the barge 'Lawrence J. Tomlinson';

"6. In allowing the headway of the tug to be suddenly arrested;

"7. In doing nothing to avoid the several collisions between the tug and her tow;

"8. In damaging libellant's barge."

At the close of the trial the libelant's proctor stated that, in addition to the foregoing, he relied on the use of short hawsers, and the fact that the attempt was made, at all, to tow through the ice field. And, lastly, that the barge was put in another tow as the hawser boat to go through a channel in the ice, which involved putting another boat astern of the tanker, and that the barge was pushed ahead through the ice, and occasionally towed alongside.

The Tomlinson is a steel barge, 200 feet long and 36 feet in beam, straight ended at the stern, with a raked or shovel bow with rounded corners; at the bow the rake commences about 2 feet below the level of the deck.

■ The barge was being managed by Frederick Bouchard at the time involved. It is found that Mr. Bouchard telephoned to a representative of the claimant and placed an order to tow the barge to Troy to procure a cargo of tar; during that conversation a rate was agreed upon in advance of the ordinary summer rates, and it is found that the representative of the claimant company called Mr. Bouchard's attention to the fact that ice was probably in the Hudson River; that Bouchard contracted for this special service, namely, the taking of the barge to Troy alone under the power of this particular tug, knowing that ice was likely to be encountered. Thus he assumed the risks incident to the probable presence of ice in the river, but not responsibility for the tug's possible negligence in towing through the ice. The Red Star No. 18, 1932 A. M. C. 1004;[1] Monk v. Cornell Steamboat Co. (C. C. A.) 198 F. 472.

■ Unless the testimony establishes negligence upon the part of the tug, the libelant fails.

The barge left Jersey City on February 18th at about 9:45 p.m. in tow of the Cornell No. 21, and reached Catskill Point on the night of February 19th, and was tied up there early in the morning of February 20th, icebound because of the presence in the Hudson River of packed ice.

Before reaching Catskill, there was a stop made at Newburgh, and there skim ice was encountered, and the barge was towed alongside the tug through that. It is found that no damage was thereby occasioned. Between Newburgh and Catskill, there was apparently a barrier of ice at or near Esopus which caused a delay until a change in the tide loosened the ice, and the trip was resumed. Upon reaching Saugerties another similar de-

---

[1] Summary.

16

lay ensued, which ended when an upbound tow passed ahead, and the pathway it made was followed by this tow, to Catskill.

The Court has not received the benefit of any discussion of the testimony on behalf of the libelant; two letters have been written, containing citations of cases, and the argument that two tugs should have been provided to do this towing; the libelant's exhibits have not been submitted with the said letters. The libelant's only witness was the bargee, who said that he did not see the damage done, nor did he state when it happened. There is no reason to think that events prior to the departure from Catskill are relied upon, because it does not appear that the bargee inspected his vessel while at that place, where the tow was tied up for about four hours. If the bargee suspected damage at that time, he had ample opportunity to seek for it and communicate any possible discovery to the tug.

Departure from Catskill was had at about 6:00 a. m. on February 20th.

The incidents of that day are to be gleaned from the testimony of the captain of the barge, the captain and the pilot of the No. 21, Robert Oliver, the superintendent of the claimant company, and Van Schaack, the captain of the tug Kookaburra.

The Kookaburra arrived with a tow of four or five vessels at Catskill at about the time that this tow arrived, and during the day of the 20th there was cooperation between the two tows in getting through the packed ice.

From the said testimony, it appears that the No. 21 took the barge out from Catskill at about 7:00 o'clock and into the field of packed ice, which was composed of many large cakes from 1 to 2 feet thick, which field extended from the westerly almost to the easterly shore of the river, and about 500 feet from south to north.

Little or no progress could be made. The ice is described as broken ice, jammed and packed. The tide was flood, and so continued until about 11:00 o'clock, and during that interval the tug was towing the barge on short, i. e. 8-foot, hawsers, so that there was about 6 feet separating the stern of the tug from the bow of the barge. A time came when no progress could be made and the tug cast loose the hawsers and proceeded alone through the ice for a short distance, breaking a passageway, and then returned to the barge, picked up the hawsers and proceeded through the space thus cleared, until another barrier was encountered, when the proc-

ess was repeated. It should be stated that the tug is about 86 feet long and has a beam of 19 feet, so that the width of the passageway that she cleared by her own exertions was the same as the beam of the tug plus the action of the quick water, but probably the passageway was not quite as wide as the beam of the barge.

It is found that there was no backing and filling with the tug made fast to the barge as argued by the libelant. It is probable that, on one or more of the occasions when the tug was stopped while having the barge in tow, the bow of the latter struck the stern of the tug as the result of that stoppage, but the tug's stern was protected by adequate fenders, and it is difficult to understand how a blow resulting from the momentum of the barge travelling slowly (1 mile an hour) through about 6 feet, after the tug was stopped by ice, could have involved a severe enough impact to inflict substantial damage upon the bow plates of the barge in the rake, and yet that is the only credible explanation of the damage.

While progress was being attempted in this manner, the Kookaburra approached with a tow of five grain barges, and the tug captains agreed that it was to their mutual advantage to combine the tows; the Tomlinson was made the hawser boat and the No. 21 towed the flotilla, while the Kookaburra went ahead and made a passageway through the ice. This arrangement was changed before the arrival of the combined tows at Castleton; that is to say, the Kookaburra became the towing boat and the No. 21 towed ahead, but the ice field had been cleared when this took place.

Such progress was made that Castleton was reached, and there the flotilla was fogbound from about 7:00 until 9:30 p. m., when the No. 21 again took the Tomlinson alone in tow, and proceeded to Troy.

During all of this time the bargee of the Tomlinson, according to his cross-examination, made no complaint of anything that was being done. He said that on arrival at Troy he found "big bumps" in the plates and bent frames, all in the bow, but complaint was not made by the bargee to the captain of the tug at Troy. The barge took her cargo and the No. 21 towed her back to New York, and it is found that no damage was occasioned on that trip. The bargee reported the damage to his owner's husband, but not to Bouchard, the manager.

The barge made still another trip to Troy commencing March 1st, in tow of this tug,

and there was no damage on that trip; but on the return from the second trip to Troy and following discharge of that cargo on March 4th, the barge was taken to the shipyard and on March 7th notice of survey was given to the claimant company, and thereafter a survey was held and the damage noted.

It was from about the water line to 4 feet above the water line while the barge was light, and was across the bow, the center of the damage being amidships about 5 feet from the bottom of the bow; the midship plates were bent inwardly and buckled while the plates closer to the two sides were not bent so much. The corners had practically no damage. The inboards, the stiffeners and the braces which were bent were 3 or 4 feet from the bottom; in other words, the damage was about 2 or 3 feet above the light water line, and the barge drew about 18 or 20 inches when light.

It is difficult to resist the conclusion that the damage was occasioned while the barge was in the ice pack and probably was the result of the barge's overriding the stern of the tug, but the evidence does not disclose that the tug was guilty of negligence in any of its maneuvers while the tug and the tow were laboring in and through the packed ice.

The overriding was not shown to have been the result of negligence, and the tug was suitably equipped with fenders to mitigate its probable effect; there was no backing of the tug into the barge; the tug could not prevent the arrest of its own progress by ice, for it could not clear a passage through the entire field in one effort, and return to the barge in time to take advantage of the channel before the latter would close.

The use of short hawsers was proper. Joseph Clark v. The Bear, 11 F.(2d) 607 at page 608.

It is found that there was no towing alongside, except through the skim ice which caused no damage, and except such as might have been required to put the Tomlinson in the combined tow at or above Catskill. That movement was brief and may have involved pushing the barge from astern, although the tug captain says it was a lateral movement, but there is no evidence of damage occasioned thereby.

There is nothing in the testimony to support the suggestion that departure from Catskill by the tug constituted negligence in itself. Other tows were navigating the river, and this contract for towage by this one particular tug was entered into with the understanding that ice would be encountered in all probability. The only way the tug could perform the contract was to make the effort which she did. With respect to combining with the tow of the Kookaburra, there is no evidence of negligence in the method of accomplishment, or in the manner in which the combined tows were handled.

For failure of proof, the libel will be dismissed with costs. Settle decree.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.