**CONNERS MARINE CO., Inc., v. WATHEN et al.**

No. 16225.

District Court, E. D. New York.

Feb. 10, 1942.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libellant.

Horace T. Atkins, of New York City (William Weymar, Jr., of New York City, of counsel), for respondent Robert B. Wathen.

Foley & Martin, of New York City (James A. Martin and Christopher Heckman, both of New York City, of counsel), for respondent-impleaded.

ABRUZZO, District Judge.

This libel alleges that on March 13, 1941, the scow "Adelaide" was orally chartered to the respondent, Robert B. Wathen; hire to commence on March 14, 1941, and to continue until the scow was returned within the towing limits of New York Harbor in the same good order and condition as when received, less ordinary wear and tear. The libellant, owner of the scow "Adelaide", contends that the scow was delivered to the respondent, Robert B. Wathen, in good condition but that when it was returned on March 17, 1941, there was extensive damage on the starboard side, forward of amidships. The Card Towing Line, Inc., was impleaded as a respondent.

A resumé of the circumstances involved will clearly indicate that the respondent-impleaded, the Card Towing Line, Inc., is not responsible in any way for the damage alleged to have been caused to the "Adelaide" and it must, therefore, be exonerated.

On March 14, 1941, the "Adelaide", when delivered to the respondent, Robert B. Wathen, was in good condition. When she was returned on March 17, 1941, however, she had incurred extensive damage. The top log was broken as well as the cover board and six planks on the side. The knee was also broken and one deck beam was split. This testimony was given by the carpenter-foreman employed in the libellant's yard. The libellant was handicapped in offering direct proof concerning the damage sustained since, unfortunately, the master of the scow "Adelaide" had been murdered two weeks prior to the trial. The respondent, Robert B. Wathen, did not present any direct evidence as to the cause of the damage for his witnesses either had no knowledge of the situation or could not testify as to the cause of the damage.

Piecing together whatever evidence was adduced, it develops that after orally chartering the "Adelaide" Wathen, the respondent, had it towed by the tug "Raymond Card" to his barge "Darien", then resting on the bottom of Red Hook Flats ladened with a deck load of spiling. With the aid of a derrick hoister, moored next to the barge "Darien", spiles were lifted from the "Darien" to the "Adelaide". This was done to lighter the "Darien" so that after the water was pumped from her hold she would float. After operations had ceased for the day, it seems that the main deck of the "Darien" was awash, the spiles being submerged except for the top tier; but the deck of the "Adelaide" was above the forecastle deck of the "Darien". The "Adelaide" was left by the tug with one and facing the forecastle head of the "Darien" and the line from the scow's end to the forecastle head bitt of the "Darien" was made fast by the tug's deckhand and the master of the "Darien". The scow master was on his own vessel to slacken up the line so that it could be put on the bitt.

After that, it appears that only the master of the scow "Adelaide" remained at the scene of operations. The derrick had been hauled away, the tug had left with its crew and the respondent, Robert B. Wathen, had returned to shore in a small boat. The "Adelaide" had not been damaged up until that time.

During the night, the spiles from the deck of the "Darien" broke adrift when the tide changed and were carried to Sandy Hook. On March 15, 1941, Wathen, the respondent, ordered the Card Towing Line, Inc., to go down to Sandy Hook to gather up the load of spiles which had gone adrift. As to whether the respondent, Robert B. Wathen, was at the scene of operations on the morning of March 15, 1941, is questionable, since he testified he probably saw the "Adelaide" on that morning but he could not be certain. (Record p. 19.)

It is the libellant's contention that the floating mass of spiles caused the damage to the "Adelaide". It is not denied that they did break loose. However, respondent, Wathen, gave no evidence as to whether or not the deck load of spiles, partly submerged as they were, had been properly fastened and secured by cables or hawsers to the rails and bitts of the "Darien" to prevent their going adrift during the change of tide. This is a most important point, since it should have been foreseen that the mass of spiles might go adrift.

■ It has been conceded that the scow was delivered to Robert B. Wathen, the respondent, in good condition. In support of its claim for damages, the libellant urges that the charter of a harbor vessel without motive power and with a crew of only one amounts to a demise and gives to the charterer possession and control of the chartered vessel, making him the owner pro hac vice. Authority for this principle is expressed in Monk v. Cornell Steamboat Co., 2 Cir., 198 F. 472, 474, as follows:

"We think the real question in the case is whether the Edison Company was owner pro hac vice and its orders to the respondent as to the navigation of the boat the same as if given by the owner. That very learned and experienced admiralty judge, Addison Brown, held that time charters of boats without motive power, even though in charge of a care keeper for the owner make the charterer owner pro hac vice. The Daniel Burns, D.C., 52 F. 159:

" 'But upon the proof as to the hiring of the boat, I do not think the facts show that either the Burns' or her owner was liable for a mere deficiency of grain found on unloading. There was no charter of the boat in the ordinary sense. The boat was merely hired by the libelant, in accordance with a very common practice, for an indef-

inite time, at the rate of $2 a day, for use by libelant in storing or carrying its grain about the harbor; that price to be paid for each day that any cargo was aboard. The boat, so far as respects loading and unloading, her navigation, and the delivery of cargo, was to be subject wholly to the orders and control of the libelants. The price of $2 per day included a man, who was called a captain, who stayed upon the boat, and whose business it was to attend to her and keep her pumped out as necessary. But this man had nothing to do with the loading, trimming, or unloading of the cargo, nor with the navigation of the boat; and the canal boat had no motive power of her own. Whatever navigation there was, was to be done exclusively by the libelant. When any cargo was to be delivered, the libelant would cause it to be towed; and the cargo, or so much of it as might be sold, would be transported by the libelant to the place where the buyer wished to remove it. * * * The boat was in legal effect delivered to the libelant. The libelant, in putting its grain on the boat, did not part with the possession of the grain, nor deliver it to the boat owner. On the contrary, the boat was delivered to the libelant, and was legally in its possession, custody, and control. The libelant was owner pro hac vice.'

"We are content to follow this, the effect of the charter was to give the charterer entire control of the movements and navigation of the boat and the fact that the owner paid the man in charge, who was only a watchman and caretaker, is not sufficient to prevent the charter from being a demise of the boat."

See, also, The Willie, 2 Cir., 231 F. 865, which cites Monk v. Cornell Steamboat, supra.

■ In Ira S. Bushey & Sons v. W. E. Hedger & Co., 2 Cir., 40 F.2d 417, is expressed the authority for the libellant's contention that the presumption of the charterer's negligence arises in the beginning from the fact that a boat, seaworthy when delivered, is damaged while in the possession of the charterer and cannot be returned in good condition. That opinion observes at pages 417 and 418 of 40 F.2d:

"The libelant chartered its barge Hughes Line to respondent, furnishing and paying the bargee. The barge was without motive power, had been dry-docked just before the charter was made, and was used for carriage of cargo from New York to Buffalo through the barge canal. The barge was seaworthy when chartered, but, when redelivered, after two months, was damaged to an extent not accounted for by ordinary wear and tear. The libel set forth the making of the charter, the return of the barge in damaged condition, and alleged that the damage was caused by neglect on the part of the respondent in not properly caring for it and in not returning it in the same condition as when received, ordinary wear and tear excepted.

*    *    *    *    *    *    *

"The trial judge directed an interlocutory decree for the libelant on the ground that it was 'encumbent upon the charterer to show that the damages had not been sustained through its negligence.'

*    *    *    *    *    *    *

"But, when the barge is injured while in the exclusive possession of a bailee, the latter has the duty of going forward with evidence to explain the cause of the damage and to show that it was due to no lack of care on its part.

*    *    *    *    *    *    *

"As matters stand, the respondent offered as a defense the letters indicating, if they were of any probative value, that the damage was caused by negligent towage, and the testimony of five witnesses that no damage of the sort occurred. Such repugnant testimony afforded no sufficient explanation to meet the presumption that the damage was due to the fault of the charterer. The latter did not show freedom from negligence. In our opinion the trial judge rightly disposed of the issues."

Aside from the principles of law enunciated in these foregoing citations, the evidence in the case at bar decisively indicated that the breaking loose of the spiles could have caused and in all probability did cause the damage to the "Adelaide", the happening of same having arisen through the direct negligence of the respondent, Robert B. Wathen.

The libellant is entitled to a decree against the respondent, Robert B. Wathen. The respondent-impleaded, Card Towing Line, Inc., is exonerated.

The authorities cited by the respondent in support of his contention that he is not liable relate to chartered vessels similar to the libellant's scow but held respondents are not liable for damages incurred through lack of duty or want of care on the part of the captains of the vessels damaged. Negligence on the part of the master of the scow "Adelaide" was not proved and the

cases cited by the respondent are not analogous to this case.

The following findings of fact and conclusions of law are therefore found.

### Findings of Fact.

1. The scow "Adelaide" was chartered orally by the respondent, Robert B. Wathen, hire to commence March 14, 1941, and to continue until the scow was returned within the towing limits of New York Harbor in the same good order and condition as when delivered, less ordinary wear and tear.

2. The scow "Adelaide" was returned on March 17, 1941, with extensive damage on her starboard side, forward of amidships. The top log was broken as well as the cover board and six planks on the side. The knee also was broken and one deck beam was split.

3. The Card Towing Line, Inc., respondent impleaded, toward the "Adelaide" along side of the barge "Darien" on March 14, 1941.

4. At the end of the day on March 14, 1941, the master of the scow "Adelaide" remained at the scene of operations. The derrick had been hauled away, the Card Towing Line, Inc., tug had left with its crew, the respondent, Robert B. Wathen, had returned to shore in a small boat, and none of his employees stayed.

5. Up until that time, the "Adelaide" had not been damaged.

6. The "Adelaide" was left by the tug with one end facing the forecastle head of the "Darien" and the line from the scow's end to the forecastle head bitt of the "Darien" was made fast by the tug's deckhand and the master of the "Darien".

7. The deck load of spiles broke adrift when the tide changed and were carried to Sandy Hook.

8. The floating mass of spiles caused the damage to the "Adelaide".

9. The respondent, Robert B. Wathen, had not properly fastened and secured the deck load of spiles by cables or hawsers to the rails and bitts of the "Darien" to prevent their going adrift, although this contingency should have been foreseen.

10. The charter amounted to a demise and gave possession and control of the scow "Adelaide" to the respondent, Robert B. Wathen, making him the owner pro hac vice.

11. The floating mass of spiles broke adrift through the negligence of the respondent, Wathen.

### Conclusions of Law.

1. The respondent, Robert B. Wathen, is at fault for failing to return the scow in the same good order and condition as when delivered, less ordinary wear and tear, since the respondent was in possession and control of the chartered vessel as owner pro hac vice.

2. The respondent, Robert B. Wathen, is at fault for failing to properly fasten and secure the floating mass of spiles to prevent their going adrift.

3. The damage was caused by the floating mass of spiles.

4. The Card Towing Line, Inc., was not guilty of any fault.

5. The libellant was not guilty of any fault.

6. The petition impleading the Card Towing Line, Inc., should be dismissed with costs.

7. The libellant is entitled to a decree against respondent, Robert B. Wathen, together with interest and costs.