**THE JOAN KUNKEL.**

**THE EDNA MAY.**

No. 17705.

District Court, E. D. New York.

March 14, 1947.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for claimant-respondent.

BYERS, District Judge.

In this cause the libelant seeks to recover damages in the amount of $7,000 said to have been suffered by the barge Joan Kunkel when she was being towed from a dock on the westerly shore of the Quinnipiac River at New Haven, Connecticut, to an anchorage off City Point about 1¾ miles below the dock, on January 31, 1945, as the result of striking ice.

The tug Edna May had her in tow, and the charges of fault, in addition to the stereotyped ones, are that she failed to take proper precautions to avoid injury to the Joan Kunkel by ice; failed to arrange the tow properly; failed to clear a path for the Joan Kunkel; allowed the Joan Kunkel "to come into forcible contact with large and heavy cakes of ice"; proceeded at an immoderate rate of speed under the circumstances; and failed to navigate with due regard for existing conditions.

On February 6, 1945, the witness Hague, a marine surveyor, attended on the Kunkel in connection with a requested certificate of seaworthiness, and he found the vessel aground alongside the Wyatt dock. He examined around the bow on both port and starboard sides, and discovered three strakes on both sides and adjacent timbers cut and broomed, and that condition extended aft about 30 feet from a point six to eight feet aft of the stem; side planks, originally four inches in thickness, had been reduced to two inches as the result of recent gouges. On the starboard side forward, namely, 10 feet aft of the stem, a side plank was broken through and crushed in to the depth of 10 inches, and seam caulking on both sides was pulled and disturbed at various locations, and all of this damage appeared to be of recent origin.

That inspection was not a survey of which the claimant had notice, and the latter offered in evidence a copy of the survey held on February 29, 1945, at Sparrows Point, Maryland, which was ex parte so far as the claimant was concerned, which seems to have been held in connection with a claim against underwriters.

The damage according to that document could be repaired for $4,721.25, and included five items not alleged to have been incurred in the towing in question, such as ninety fathoms of anchor chain cable and a 2200 pounds anchor, and the renewal of the port hawse pipe and a port wildcat; these were substantial items, and, being subtracted from the above sum stated in the survey, leave a considerable margin between the $7,000 demanded in the libel and the reasonable amount of the ice damage here alleged.

The Kunkel is a wooden, coastwise barge, having a sharp bow and square stern, and her dimensions are 204.5' by 32' with a depth of 14.7' and draft 10.5', and on the day in question she lay port side to the Schiavone-Bonomo Dock at New Haven, where she took a cargo of scrap iron to about ⅔ of her capacity, namely, 800 to 900 tons.

As laden, the Kunkel drew 10½ feet forward and 12 feet aft.

The tug Edna May had been instructed by libelant to remove the Kunkel from the dock to the anchorage, and arrived at about 1:30 p. m. for this purpose; in order to do so, she had to make her way through solid ice of a thickness of about 4", which had formed in the river for a distance of about a mile below the dock.

The Edna May is a steamtug, 88' long by 20' in beam, and her engines turn up 350 horse power.

There is no conflict between the testimony of Daugherty, the bargee of the Kunkel, and Erickson, captain of the tug, that the latter opened a path or lane through the ice before she made fast to the Kun-

kel, by steaming back and forth and breaking the ice loose, except as to the width of the path so cleared; Daugherty says it was about the width of the tug, namely, 20', and Erickson says it was 40' to 45'.

Clearly Daugherty must be wrong, because a 32' barge could not proceed in a 20' pathway of broken ice; nor is it likely that the tug would have started the towing operation under such conditions.

Since the Kunkel lay with her port side to the dock and she was towed bow first, it was necessary to clear a space in the water off the dock sufficient to allow her turning, and this was done; then the Kunkel was taken on a 15 to 20 fathom hawser and, as so made up, the tow proceeded toward the anchorage.

The bargee went into the wheel-house and undertook to steer the barge as she followed the tug, but he testified that he could not do this because the hawser was too short, and after a brief interval of time he abandoned the effort to steer. He does not mention the speed that the tow made, but he says that they were about two hours in covering the mile and a half down to the second railroad bridge, beyond which lay the anchorage ground. The chart does not bear him out in this estimate of distance, but his testimony is in accord with the tug captain's as to the rate of progress, namely, about a mile an hour.

Daugherty says that, as the tow proceeded, the Kunkel was moving from side to side, breaking ice, namely: "We would swing from side to side, say 5 or 6 feet" and then strike the ice, meaning, it is supposed, the unbroken ice, "strong enough to jar the boat, and the hardest blows were say *15 to 18' aft* of the stem"; during the movement the hawser seems to have been lengthened, but where is not stated, but the bargee did say that no other ice but on the sides of the lane struck the Kunkel to amount to anything.

After the barge dropped anchor, the tug left. Apparently the bargee sounded and discovered 4' of water, and started pumps aft, and then went down into the forepeak, "less than an hour after the tug had left" and found water pouring in at the starboard bow, 4' to 5' aft of the stem, and there

seemed to be only one place that was leaking, and that was at the water-line as the Kunkel was laden.

At the time in question the Kunkel carried wooden sheathing to about 18 to 20' aft of the stem (i.e. the greatest beam of the barge), but, as she was laden, the top of the sheathing was below the water-line, which means that the sheathing afforded her no protection against the ice conditions of which she now complains.

In addition to the apparently excessive amount claimed in the libel, the following aspects of the testimony tend to militate against the libelant's asserted cause:

(1) The theory of the libel is that the damage was caused by floating ice, namely (Article Fifth): " * * * There was considerable heavy ice in the water. The Edna May proceeded to tow the Joan Kunkel through this heavy ice without taking the proper precautions to protect the Joan Kunkel from forcible contact with such ice as a result of which the Joan Kunkel struck heavily against large thick pieces of ice, *sustaining damage*."

The argument now made is that the damage was caused by striking the solid ice on the sides of the pathway which had been opened, due to the swinging of the barge at the end of the hawser. As to that, Daugherty said: "The stem (Kunkel) would move 5 or 6 feet, never got beyond *either side of tug*." This would mean that the greatest arc of swing would be described by her stern, and therefore the heavy striking would be aft rather than forward, if it is indeed contact with the ice on the sides of the path which is relied upon to sustain the libelant's case, but no such damage is shown.

(2) Since the swing was from side to side and the pathway is said to have been too narrow to admit of a safe passage, it is reasonable to expect that there would be some damage on the port side of the barge, although Daugherty says that he saw no such leak.

(3) The fact that the top of the sheathing was below the water-line is the probable explanation for the damage described and which was the result of the impact of floating pieces of ice against the bluff of the

bow as the tow proceeded; this means that, had the barge not been so heavily laden, the sheathing would have protected her from the floating ice, but that is not a circumstance which can be described as negligence on the part of the tug.

(4) The bargee made no complaint to the tug concerning the incidents of this trip or the alleged damage to his barge at any time, although the Kunkel remained in the New Haven Harbor for at least six days after the trip in question. Of course this is merely a circumstance, but it is a significant one, particularly since he spoke to Erickson the next day, when he explained that he could not get ashore and wanted to be placed near the City Dock. On that occasion he did not complain of damage caused by the towing operation. On the following day, February 2nd, Erickson got word that the captain needed a mechanic, and he took one out, and the bargee stated that there was a leak in his bow, but even then he did not complain that the damage was caused by anything that the tug had done or omitted. It is not customary for bargees laboring under a sense of injury, to be reticent on the subject—quite the contrary.

(5) Kelly, the runner for the libelant, visited the barge in obedience to a request made by the bargee, when the Kunkel was at the City Dock, and yet no notice of inspection or survey was given to the libelant in connection with the inspection made by Mr. Hague on February 6, 1945.

(6) The log entry made by the bargee is as follows: "January 31st 1945: New Haven, Conn. Wednesday. Wind N. Mod. weather, fair. Began loading at 8.00 A.M. Finished loading cargo at 1.00 P.M. Got underway with Tug Edna May of New Haven at 1.30 P.M. bound for anchorages. Anchored at 3.30 P.M. Found at 4.00 P.M. there was a hole broken into the bow or cut through with ice. Started pumps then and never had stopped the water gaining all the time."

The foregoing indicates that there was an interval of a half hour between the dropping of anchor at 3:30 P.M. and the discovery of the hole broken in the bow at 4 P.M., and the damage could have been occasioned during that interval through no fault of the tug. Moreover, there is no effort in the log entry to account for the damage or to attribute it to any fault of the tug.

In this connection it is to be noted that Daugherty had been a captain of barges for seventeen or eighteen years and had been master of a schooner, and held a license as a master of sail for an undisclosed period ending in 1921. He is therefore an experienced man, and would have been alert to the necessity for giving prompt notice of any misconduct of the tug.

Since the libelant does not charge the tug with fault for undertaking the towing operation in the face of existing conditions, I cannot conclude that the evidence establishes that the libelant has sustained its burden of proof in connection with the faults charged in the libel; as to the seventh specification, "In allowing the Joan Kunkel to come into forcible contact with large and heavy cakes of ice", I do not see how the tug could have prevented that occurrence, if it did take place, if she was to carry out the libelant's orders to move the barge as has been stated, since the speed of the movement was as low as both sides stated it to have been.

That the libelant knew of the probable conditions on January 31st follows from the experience encountered five days earlier, when the Edna May towed the Kunkel, light, up to this dock, under ice conditions which were similar in all respects, according to Erickson's testimony, although Daugherty says there was only "mighty thin ice if any". The sheathing was ample to protect the barge at that time, and probably would have been also on the outward movement, if she had not been so heavily laden. There was no protest made by the bargee concerning the danger to be apprehended from floating ice, although he knew or should have known that the sheathing was too far under water to protect the hull at the bow. Cf. Monk v. Cornell Steamboat Co., 2 Cir., 198 F. 472, and cases cited.

It follows from the foregoing that the libel must be dismissed with costs, for

476

libelant's failure to sustain the burden of proof. Findings and Conclusion are filed herewith.

Settle decree on notice.