## BISSO v. INLAND WATERWAYS CORP.

### No. 910.

United States District Court
E. D. Louisiana, New Orleans Division.
Sept. 1, 1953.

Deutsch, Kerrigan & Stiles, Francis Emmett, Rene H. Himel, Jr., Phelps, Dunbar, Marks and Claverie, New Orleans, La., proctors for libelant.

John N. McKay, U. S. Atty., Francis A. Ledet, Asst. U. S. Atty., New Orleans, La., proctors for respondent.

WRIGHT, District Judge.

This case graphically portrays the quandary in which the Marine Industry, as it relates to towing contracts, finds itself because of two decisions of the Supreme Court. In the first of these decisions, The Wash Gray (Compania de Navegacion Interior, S. A., v. Fireman's Final Insurance Company),[1] the court held, in interpreting a towage contract, that the provision "all risk to be borne by the tow" did not release the tug from liability for damage caused by its negligence, whereas in Sun Oil Company v. Dalzell Towing Company,[2] the court held valid and enforcible the so-called pilotage clause of a towage contract providing that the tug and her owner will not be liable for any damage resulting from orders given by the tug captain to the assisting tugs while the tug captain is aboard the assisted vessel.

Respondent here, in an effort to protect itself under this state of the law, used in its towage contract the general release from liability provision[3] as found in The Wash Gray and a clause[4] similar to the pilotage clause in Sun Oil Company v. Dalzell Towing Company. It urges either or both of these provisions, as well as other release language in the contract[5], as a defense to the action by the libelant charging damage to its barge as a result of the negligence of the respondent's tug.

The litigious history of the release from liability clause in towing contracts properly begins in 1872 with The Steamer Syracuse[6] in which the Supreme Court announced the principle that where a towage contract recites that the towage is to be performed "at the risk of the master and owner" of the tow, the tug is not exempt from liability for its own negligence. Following the Syracuse there arose a conflict between the Court of Appeals for the Second Circuit[7] and the Court of Appeals for the Ninth Circuit[8] in respect to the enforcibility of the release from liability clause where negligence on the part of the tug is shown, the Second Circuit, finding that the Supreme Court in The Syracuse had not squarely decided the point, held that where a towage contract provided that the towage would be at the risk of the towed vessel, such contract exempted the tug from liability even for its own negligence. The Ninth Circuit, on the other hand, assuming The Syracuse to be a square holding on the effect of a release from liability clause, held that the clause did not relieve the tug from liability for its own negligence. This conflict apparently was resolved in favor of the Ninth Circuit by the Supreme Court in The Wash Gray wherein it was held that a contract which provided that all risk would be borne by the towed vessel did not relieve the tug from liability for its own negligence.

Four years later, however, in Sun Oil Company v. Dalzell Towing Company, the Supreme Court held valid and enforcible, against a charge of negligence, the so-called pilotage clause of a towage contract

1. 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, 1928 A.M.C. 923.

2. 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, 1932 A.M.C. 149.

3. The provision reads as follows:
"(4) The movement contemplated will be done at the sole risk of the 'craft to be towed' and its cargo,"

4. The clause reads as follows:
"The masters and crews and employees of all boats and/or other equipment assisting the 'craft to be towed' shall, in the performance of said service, become and be the servants of the 'craft to be towed', regardless of whether the 'craft to be towed' assists in the service in any way and irrespective of whether they be aboard the 'craft to be towed' or in command thereof."

5. The other release language reads as follows:
"* * * and neither the boats and/or any other equipment used in said service nor the owner, charterer or hirer thereof shall be liable for any loss or damage to the 'craft to be towed' or its cargo nor for any damage done by the 'craft to be towed', however occurring."

6. 12 Wall. 167, 20 L.Ed. 382.

7. The Oceanica, 170 F. 893; Ten Eyck v. Director General of Railroads, 267 F. 974.

8. Alaska Commercial Co. v. Williams, 128 F. 362; Mylroie v. British Columbia Mills Tug & Barge Co., 268 F. 449; Sacramento Navigation Co. v. Salz, 3 F.2d 759.

in which it was provided that the employees of the tug became the employees of the tow when aboard the tow directing the nagivation of the tug. In so deciding the Supreme Court said[9] that the validity of the clause could not be reasonably doubted, that no rule of public policy makes invalid a release clause even as to negligence, and that the highest public policy is found in the enforcement of the contract as it was written.

Since these two decisions, the position of the Supreme Court with respect to release clauses has been a matter of much speculation by the lower courts and by law writers. Unfortunately, in The Wash Gray the court did not disclose its reasons, other than citing The Syracuse, for holding the release clause unenforcible as against the tug's own negligence, and in Sun Oil Company v. Dalzell Towing Company, while the principles underlying the court's conclusion were clearly stated, the clause in question was materially different from the general release from liability clause.

■ These cases can be reconciled only by assuming that the Supreme Court in The Wash Gray refused to enforce the release clause against a charge of negligence on the part of the tug, not because it was against public policy so to do, but because it felt that the language of the release clause there in suit was not sufficiently unequivocal to release the tug from liability for its own negligence, it appearing that in neither The Syracuse nor The Wash Gray did the clause in question specifically say that the tug was released from liability for its own negligence. This conclusion is supported by the fact that the Supreme Court has held that a tug is not a common carrier and owes its tow only the duty of ordinary care [10] and, consequently, the doctrine that common carriers and others under like duty cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence is not applicable to the contract of towage.[11] Therefore, since the contract of towage is not so affected with a public interest as to make a release from liability clause against public policy and since the highest public policy is found in the enforcement of a contract as it is written, there would seem to be no reason why such clause should not be valid and enforcible even as to the negligence of the tug, provided the agreement of the parties on this point is clear and unequivocal.

■■ Applying the above principles to the case at bar, it is clear that the general release clause in the contract in suit is unenforcible under The Wash Gray, the tug's exemption from liability for negligence not

9. In Sun Oil Company v. Dalzell Towing Company, 287 U.S. at page 294, 53 S.Ct. at page 136, the court said:
    "The validity of its applicable provision cannot reasonably be doubted. So far as concerns the service to be rendered under the agreement, respondent was not a common carrier or bailee or bound to serve or liable as such. Towage does not involve bailment, and the services covered by the contract were less than towage. Stevens v. The White City, 285 U. S. 195, 200, 52 S.Ct. 347, 76 L.Ed. 699. There is no foundation in this case for the application of the doctrine that common carriers and others under like duty to serve the public according to their capacity and the terms of their undertaking cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence. New York Central Railroad Co. v. Lockwood, 17 Wall. 357, 21 L.Ed. 627; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 440, 9 S.Ct. 469, 32 L.Ed. 788. Respondent had no exclusive privilege or monopoly in respect of the services that petitioner desired to have performed for its tanker. And petitioner was under no compulsion to accept the terms of respondent's pilotage clause. There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length. There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made.' Santa Fe, P. & P. Ry. Co. v. Grant Bros. [Const.] Co., 228 U.S. 177, 188, 33 S.Ct. 474, 478, 57 L.Ed. 787."

10. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, 1932 A.M.C. 468.

11. Sun Oil Company v. Dalzell Towing Company, supra.

being sufficiently spelled out. The so-called pilotage clause, however, presents a greater problem. The pilotage clause here differs from the pilotage clause in Sun Oil Company v..Dalzell Towing Company in that it is provided that the employees of the tug are employees of the tow irrespective of whether they are aboard the assisted vessel. The difference in the clause indicates the difference in the type of service performed. In Sun Oil Company v. Dalzell Towing Company the tower was required under his contract to move a sea-going vessel of considerable size through a crowded harbor to a dock. That service is customarily performed by the tug captain boarding the assisted vessel and directing her navigation as well as the navigation of the tug or tugs. Here the service required under the contract was simply towing a dumb barge from one port to another. While the difference in the service to be performed under the Sun Oil contract and the contract here is obvious, the facts of the two cases are not so different that a different result should be reached as to the validity and enforcibility of the clause in question. The general principles announced by the Supreme Court in Sun Oil Company v. Dalzell Towing Company are certainly broad enough to cover the pilotage clause here and since the language of that clause together with the other release language in the contract clearly evidences the obvious and unmistakable intent of the parties that respondent be relieved from liability for its own negligence, the claim of libelant herein must fail.

Decree pursuant to the findings of fact and conclusions of law this day found.

### Findings of Fact

1. On September 15, 1941, New Orleans Coal and Bisso Towboat Company chartered its steel bank barg Bisso No. 9 to National Oil Transport Corporation for a period of two years, from December 1, 1941, to December 1, 1943. The charter which was thereafter extended to November 15, 1944, provided:

"Lessor consents that Lessee may contract to have the barge towed pursuant to a towing contract in substantially the form of the towing contract employed by Federal Barge Lines (Form A194–Rev.) which form of contract contains the following clause:

" 'The movement contemplated will be done at the sole risk of the "craft to be towed" and its cargo and neither the boats and/or other equipment used in such service nor the owner, charterer or hirer thereof, shall be liable for any loss or damage to the "craft to be towed" or its cargo, nor for any damage done by the "craft to be towed" however occurring; provided, however, the tug to which this barge may be allocated shall be approved by the Hull Underwriters on the barge.' "

2. On December 1, 1943, National entered into a blanket contract of towage with Federal Barge Lines, whereby Federal agreed to tow a number of National's barges, including The Bisso No. 9, on the Mississippi River. This contract provided:

"(4) The movement contemplated will be done at the sole risk of the 'craft to be towed' and its cargo, and neither the boats and/or any other equipment used in said service nor the owner, charterer or hirer thereof shall be liable for any loss or damage to the 'craft to be towed' or its cargo nor for any damage done by the 'craft to be towed', however occurring.

"The masters and crews and employees of all boats and/or other equipment assisting the 'craft to be towed' shall, in the performance of said service, become and be the servants of the 'craft to be towed', regardless of whether the 'craft to be towed' assists in the service in any way and irrespective of whether they be aboard the 'craft to be towed' or in command thereof."

3. In early May, 1944, respondent's towboat Cairo took in tow, eight loaded barges belonging to various persons, and proceeded up the Mississippi River from New Orleans. Libelant's steel tank barge Bisso No. 9 was one of these barges, and was bound for Cairo, Illinois, with a cargo of gasoline.

4. The Cairo's tow was split up at or near Vicksburg, Mississippi, and moved al-

ternately in groups of four barges, or "double tripped", due to the high waters and dangerous conditions prevailing in the Mississippi River above that point at that time.

5. The group of four barges here involved was made up at Vicksburg two abreast, and was being pushed ahead of The Cairo, pursuant to the custom on the Mississippi River. The IWC 240 and IWC 321 were the port and starboard face barges; The Bisso No. 9 was the port lead barge and The APL 102 the starboard lead barge. The barges were secured to each other and to The Cairo by means of wires and manila lines.

6. The flotilla arrived in the vicinity of the Greenville Highway Bridge (MAHP 522.3) at approximately 3:00 A.M. on May 12, 1944. The Mississippi River at this point has a navigable width of some 2,200 feet.

7. The Greenville Highway Bridge is constructed on a number of concrete and steel piers, two of which are sunk in the river bottom approximately one-third of the distance from the east and west banks respectively, thus making three spans all of which are navigable during high water. The center span is 800 feet in width and is designated as the "navigation span". The east and west spans are slightly narrower than the center span. Above the Greenville Bridge there was a large submerged sand bar that ran some 600 or 700 feet out from the east bank. This bar created large eddies, or whirlpools, for approximately one-third of the width of the river out from the east bank, and rendered navigation through the east span dangerous. In the other two-thirds of the river the current flowed swiftly, at approximately seven miles per hour, in the direction of the west bank. In this section of the river there were large "boils" or turbulences in the water making steering extremely difficult. This condition was normal at that point on the river during high water.

8. The Cairo attempted to pass through the east or right ascending span with her tow, but this maneuver proved unsuccessful because the current was too swift, and an eddy was pulling the tow toward the east bridge-pier. The Cairo accordingly dropped down-river, out of the east span, approximately 1,000 feet below the Greenville Bridge. The pilot and master then attempted to proceed full ahead through the center or navigation span.

9. When The Cairo and her tow were under the middle of the center span, the flotilla lost all headway. The master and pilot then rang the engine room for emergency full ahead. This signal was answered by the engine room, and the shaft speed was increased four or five revolutions, which accelerated the flotilla's speed through the water thirty-five feet per minute, or less than one-half mile per hour. Shortly after the flotilla's speed was increased, a large "boil" threw the bow of The Cairo's tow toward the east bank of the river. To compensate for this movement, The Cairo's rudders were put hard left. The flotilla "crabbed" or made leeway to starboard under this maneuver and the port lead barge (APL 102) struck the east pier of the Greenville Bridge abaft her starboard beam. The impact of the collision parted the port coupling wires securing The Bisso No. 9 and The IWC 240. The Bisso No. 9 pivoted on the starboard coupling wire, which was still intact, and was swept up against the east bridge pier where she buckled amidships, turned over and sank.

### Conclusions of Law

1. This court has jurisdiction over the subject matter of this action and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

2. When a moving tug brings her "dumb tow" into collision with a stationary object, there is a presumption that the collision occurred through the negligence of the tug. The Granite State, 3 Wall. 310, 314, 70 U.S. 310, 314, 18 L.Ed. 179; The Clarence P. Howland, 2 Cir., 16 F.2d 25, 1927, A.M.C. 564; The Crown of Galicia, 2 Cir., 232 F. 305; The W. H. Gilbert, 6 Cir., 232 F. 547; The J. N. Gilbert, 5 Cir., 222 F. 37; The Thode Fagelund, 2 Cir., 214 F. 775.

3. This presumption of negligence runs in favor of the "dumb tow" as well as the

stationary object; and the tug bears the burden of going forward with proof that no act or omission on her part caused the collision in order to exculpate herself from fault. The Steamer Webb, 14 Wall. 406, 414, 81 U.S. 406, 414, 20 L.Ed. 774; Simkins v. R. L. Morrison & Sons, 5 Cir., 107 F.2d 121, 1940 A.M.C. 24, 26; The Clarence P. Howland, supra; Kiernan v. Lake Champlain Transportation Co., 2 Cir., 273 F. 499, 501; The W. G. Mason, 2 Cir., 142 F. 913, 915.

4. The Towboat Cairo was negligent in attempting to negotiate a passing under the center navigation span of the Greenville Highway Bridge, with a tow of four loaded barges, against a seven-mile current, from a position dead in the water, one thousand feet below the span. One thousand feet was not sufficient distance to permit the heavy flotilla to reach full speed, known to be necessary to negotiate the span against the swift current and "boils" prevailing in the river at that point.

5. The Towboat Cairo was negligent in failing to break up her tow of four loaded barges into groups of two, "double tripping" them through the Greenville Highway Bridge when difficulty was anticipated, or should have been anticipated, in negotiating the span against the swift current and "boils" prevailing in the river at that point. Kiernan v. Lake Champlain Transportation Co., supra.

6. The charter between the New Orleans Coal and Bisso Towboat Company and the National Oil Transport Corporation dated September 15, 1941 was a demise of the vessel to the charterer and the National Oil Transport Corporation became the owner thereof pro hac vice. Consequently, the contract of towage entered into between the National Oil Transport Corporation and respondent is binding on libelant, the owner of the vessel, in respect to any claims against respondent for damage to the vessel. Monk v. Cornell Steamboat Co., 2 Cir., 198 F. 472; The Daniel Burns, D.C., 52 F. 159.

7. The provision of the towage contract which reads that "the movement contemplated will be done at the sole risk of the 'craft to be towed * * *'" does not exonerate the tug from liability for its negligence. The Syracuse, 12 Wall 167, 171, 79 U.S. 167, 171, 20 L.Ed. 382; The Wash Gray (Compania de Navegacion Interior, S. A., v. Fireman's Fund Insurance Company), 277 U.S. 66, 73, 48 S.Ct. 459, 72 L.Ed. 787, 1928 A.M.C. 923.

8. The provision of the towage contract which provides that "the masters and crews and employees of all boats and/or other equipment assisting the 'craft to be towed' shall, in the performance of said services become and be the servants of the 'craft to be towed', regardless of whether the 'craft to be towed' assists in the services in any way, and irrespective of whether they be aboard the 'craft to be towed' or in command thereof * * *" when read with the other provisions in the contract relative to release from liability unequivocally evidences a clear intention on the part of the parties to the contract to relieve the tug from liability even for its own negligence. Such a provision is not against public policy. In fact the highest public policy is found in the enforcement of the contract which was actually made. It would be unconscionable to allow libelant upon the occurrence of a mishap to repudiate the agreement upon which the towage service was obtained. Sun Oil Company v. Dalzell Towing Company, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, 1932 A.M.C. 149. To hold that the towage contract did not relieve the tug from liability for its own neligence would be to stultify and set at naught the obvious intention of the parties.

Decree accordingly.